# UNITED STATES DISTRIUCT COURT
# EASTERN DISTRICT OF NEW YORK

GEORGETTE FRANZONE, GEORGE F. LLC, CAVALE TONUZI INC., & G. LIFESTYLE SPA INC.,

                              Plaintiff,


          -against-



THE CITY OF NEW YORK, THE NEW YORK CITY POLICE DEPARTMENT, NEW YORK CITY POLICE OFFICER JAUN TEJERA    and JAUN TEJERA individually, NEW YORK CITY POLICE CAPTAIN JAMES GRANT,   and JAMES  GRANT individually, NEW YORK CITY   POLICE OFFICER , ANN GUERIN, and ANN GUERIN individually, NEW YORK CITY POLICE OFFICER HANNA "ANNA" TONUZI ALVAREZ and HANNA "ANNA" TONUZI ALVAREZ, individually,  NEW YORK CITY POLICE OFFICER FRANKIE "FRANK" ALVAREZ and FRANKIE "FRANK" ALVAREZ, individually VIOLETTE TONUZI, FARIJE TONUZI-SHERIDAN, JOSEPH TRISCHITTA, MARCO VENEZIA,       WILLIAM   MASSO, LILIANA"CALOGERA" NARBONE, MARY CARBONE, HEDDA SCHACHTER, FRANK CORIGLIANO,   PROGRESSIVE   CREDIT UNION,  VIOLETTE TONUZI SALON and DAY SPA,  C. ELIAS ENTERPRISE INC., d/b/a CHARLES ELIAS SALON and SPIN SALON, John Doe and/or Jane Roe,


                              Defendants.


## SECOND VERIFIED AMEND COMPLAINT

## Case No.  CV 13/05282

## Jury Trial Demanded

Plaintiff **Georgette Franzone,** individually and in her representative capacity as an officer and director and/or shareholder of **Cavale-Tonuzi Inc., George F. LLC** and **G. Lifestyle,** by her attorneys Douglas R. Dollinger, P.C., and Associates complaining of the Defendants, alleges as follows:

1.      Plaintiff **Georgette Franzone's** allegations are based upon personal knowledge, when pertaining to herself and, all other claims being based upon information and belief, the basis of which is an investigation and research of relevant documents or reports involving official investigations obtained as well as publically available materials related to all other facts alleged in the Complaint.

## INTRODUCTION OVERVIEW OF CLAIMS

2.      The matter before this Court involves an intentional, deliberate, pre-planned, well-organized carefully executed criminal conversion of the assets belonging to a successful corporate entity salon and spa; together with the willful and criminal obstruction of the sole preferred shareholder's ownership interest.

3.      The claims involve Plaintiffs Cavale-Tonuzi Spa **("CTS")**, George F. LLC, **("George F."),** G Lifestyle Spa **("G-Spa")** and Georgette **Franzone ("Franzone")** collectively "Plaintiffs").

4.      Plaintiffs allege there exists a continuing criminal agreement, a conspiracy originally forged among two individuals, Defendants Violette Tonuzi **("Tonuzi")** and *nonparty* Charbel a/k/a Charles Elias, **("Elias").**  who are operating two separate criminal enterprises distinct from their capacities as officers/directors, employees and common

shareholders of **CTS** where each were the architects of the embezzlement/conversion of **CTS**-**Franzone** assets and good-will into separate businesses controlled and owned by them causing injury to **CTS** and the remaining Plaintiffs' Businesses and Property.

5.    **Tonuzi** and **Elias** have acted and continue to act individually and jointly with other named defendants herein in violation of the law using a fully executed Shareholders' Agreement, a Settlement Agreement and other contracts ("Agreements") as cover to commit the illegal acts alleged hereafter.

6.    These Agreements were entered into with **CTS's** preferred shareholder-**Franzone, George F. and G-Spa.**

7.    Defendants **Tonuzi** and **Elias** owed a contractual duty and a duty of loyalty to each of the Plaintiffs. Plaintiffs and others relied on the Agreements with **Tonuzi** and **Elias** for their performance and duty of loyalty in promises not to compete, or otherwise convert or use Plaintiffs' Property for their own.

8.    Notwithstanding their express written promises otherwise, Defendants **Tonuzi** and **Elias** used their positions with **CTS** to embezzle from **CTS.**

9.    Notwithstanding their express written promises otherwise, Defendants **Tonuzi** and **Elias** used their positions with **CTS** to maintain control of the affairs and the assets of **CTS** by exceeding their lawful right of ownership authority.

10.    Notwithstanding their express written promises otherwise, Defendants **Tonuzi** and **Elias** used their positions with **CTS** to engaging in fraud-embezzlement-intimidation and other illegal acts.

11.     Notwithstanding their express written promises otherwise, Defendants **Tonuzi** and **Elias** used their positions with **CTS** to enter into an agreement between themselves and other defendants named herein, where each knowingly assisted and/or aided in the embezzlement of the **CTS** assets.

12.     Plaintiffs also allege that **Tonuzi** and **Elias** conspired with a third enterprise, the New York City Police Department-Enterprise (hereinafter the "*NYPD Enterprise*"). The *RICO Defendants* of the *NYPD Enterprise* intended to further an endeavor in which the *RICO Defendants* were employed by the *NYPD Enterprise* and operated-managed the *NYPD Enterprise* through a pattern extortion in violation of New York Penal Law 155.05(2)(e)(viii) causing the Plaintiff to suffer injury to her business-property.

13.      That the collective Defendants knowingly acted-conspired with one another by means of intimidation including the  illegal use of their friends and family, each of whom were at the time active New York City Police Officers or retired New York City Police Officers; some of whom are now convicted felons, where in furtherance of the conspiracy these Defendants executed certain overt acts; wherein said acts then escalated to criminal predicate acts involving threats of physical force to the preferred shareholder **Franzone**, conversion of **CTS** assets and other illegal acts such as having **Franzone** falsely arrested, illegally taking physical possession of the **CTS** and illegally locking Plaintiffs **Franzone, George F.** and **G-Spa** out of the business.

14.     By reason of the forgoing **CTS** is now a defunct corporation where its assets

and all of its shareholder value are under the control of the ***RICO Person Defendants***.

## FEDERAL QUESTION JURISDICTION

15.     This Court has federal question jurisdiction in this case under 28 U.S.C. § 1331, as Plaintiffs have asserted claims arising under the laws of the United States. Specifically, causes of action involving federal questions related to overt and/or predicate criminal acts and continuing illegal acts alleged hereafter which cluster around the willful criminal activities of the ***RICO Person Defendants*** involving both state, federal and interstate criminal acts involving a pattern of racketeering activity in violation of the RICO Statute 18 U.S.C.  1961-1968, et seq., including, but not limited to violations of 18 U.S.C. §1341 mail fraud, and §1343 wire fraud; 18 U.S.C. §1951 illegal activities affecting interstate commerce; 18 U.S.C. §§1956 and 1957 money laundering, engaging in monetary transactions in property derived from specified unlawful activity; and 18 U.S.C. §§2314 and 2315, involving transportation of stolen property-money in interstate and foreign commerce in the execution or concealment of a Scheme or artifice to defraud Plaintiffs of money in a sum greater in value than $5,000.00.

## VENUE

16.     Venue is appropriate in the US District Court of New York pursuant to 28 U.S.C.  §1391, because a substantial part of the events giving rise to the dispute occurred in this district, a substantial part of the property that is the subject of the action is situated in this district, and the Court has personal jurisdiction over each of the parties as alleged throughout this Complaint for activities which have caused injury to the

Plaintiffs in New York and elsewhere.

## SUPPLEMENTAL JURISDICTION

17.     Because Plaintiff has asserted various claims arising under state law that form part of the same case or controversy as the claims arising under federal law, this Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for violations which constitutes grand larceny in violation of Organized Crime Control Act, New York Penal Law §§ 460.00-80, New York State Penal Law §§ 155.05(e) iv, viii and ix, New York State Penal Law §§155.35-155.42 as indictable felony offenses; Defendants' conduct also constitutes common law fraud, conspiracy, conversion, theft, larceny, aiding and abetting, breach of contract, and unjust enrichment and allows for the imposition of a constructive trust and accounting as equitable injunctive relief is sought.

## PREREQUISITE TO SUIT

18.     Plaintiff has served timely Notice of Claim upon The City of New York within ninety (90) days after the causes of action described in this complaint arose.

19.     More than thirty (30) days have elapsed since the service of the Notices of Claim.

20.     The City and its comptroller have failed, neglected, and refused to pay, settle, compromise, or adjust the claims of Plaintiffs.

21.     Plaintiffs have duly complied with all of the conditions precedent to the commencement of this action.

22.     That this action has been commenced within one year and ninety days after the cause of action of plaintiff accrued.

23.    This action complies with all statutory requirements for timeliness.

### DEMAND   FOR ACTION BY THE BOARD OF DIRECTORS AS AND FOR A FUTILITY

24.    At all times hereinafter mentioned, unless otherwise alleged, Plaintiff **Franzone** is the sole preferred shareholder and the lawful director and member of the Board of Directors of **Cavale-Tonuzi** and by virtue of her position with the Company and her ownership interest she is acting as representative for the Company as a victim of the criminal activity and as the case may be in her individual capacity in this action.

25.    Plaintiff **Franzone** has demanded and requested the company, or its present board of directors, to take action to enforce the law; the terms and conditions of the Company's bylaws and to meet its contractual obligation pursuant to the powers and authority granted to the Company's officers so as to eliminate the conduct complained of herein. Said efforts  have been futile for the reasons that:

(i)    The members of the present board of directors of the company participated in, approved, or were the beneficiaries of, the wrongful acts and conduct herein alleged and are themselves named as defendants herein;

(ii)    The entire-present board of directors of the company has, for a considerable time, been fully aware of the wrongful acts and conduct herein alleged and has nevertheless failed to take action thereon; but on the contrary, they have actively conspired to and have concealed and suppressed any information from the plaintiff and the public of the wrongs complained of, and;

(iii)    The individual defendants herein who were the beneficiaries of the wrongful acts and conduct herein alleged have dominated and controlled the company and have exercised and exerted such domination and control

for such time as has been necessary so as to accomplish their plan. Any action that might have been instituted by the company against the individual defendants to redress the wrongs herein complained of, would, therefore, have been in friendly hands and could not have been diligently and properly prosecuted by reason of the aforesaid domination, control, and influence exercised and exerted by said individual defendants; and;

(iv)    Thus, further demand upon the company to bring action to redress the wrongs herein would in effect have required its board of directors to institute suit against themselves and would have been futile.

## THE ASSOCIATION-IN-FACT RICO ENTERPRISES

26.    At all times material hereto, Cavale & Tonuzi Spa and Salon **("CTS") Violette Tonuzi Day Spa** ("VTS") and Charles Elias Salon, **(CE Spa"),** together with **Tonuzi,** Elias**, Sheridan, Grant, Tejera, Gerin, Alvarez,  F. Alverez , Trischitta, Venezia, Masso,** and **Narbone** are at times collectively and/or in varying combinations-groupings, both the **Tonuzi association-in-fact enterprise**s and/or the **Elias association-in-fact enterprise**s.

27.    Each **association-in-fact enterprise**s exists jointly and independently as controlled by the ***RICO Person Defendants,* Tonuzi** and **Elia**s or **Tonuzi** and **Sheridan**.

28.    The ***Tonuzi*** and ***Elias Enterprises* (hereafter collectively the "*Enterprises*")** exists through a purposeful, continuing interrelated and ongoing pattern of racketeering activities interplayed between the normal operations of the companies they control and the affairs of the criminal activities in the ***RICO Person Defendants*** who are distinct from the ***Enterprises***, and whose criminal activities affect interstate

commerce as these terms apply under 18 U.S.C. §§ 1951 and 1962(a)-(d).

## GOVERNMENT ENTITY RICO ENTERPRISE

29.    At all times material hereto, the New York City Police Department is a government entity and thereby an enterprise under 18 U.S.C. § 1962. *RICO Person Defendants* **Grant, Tejera, Guerin, Alvarez, F. Alverez, Trischitta, Venezia, and Masso** were directly employed by the New York City Police Department-Enterprise (hereinafter the "*NYPD Enterprise*"), for which they received the pecuniary benefit of salary, and participated in the operation-management of the enterprise by using the police powers bestowed upon them by the *NYPD Enterprise*.

## THE PARTIES

**Plaintiffs- Enterprise Victims**

30.    **Cavale-Tonuzi** is a privately held New York corporation, owned by its sole preferred shareholder **Georgette Franzone**, and two (2) other individuals, common shareholders **Violette Tonuzi and Charbel a/k/a Charlie Elias**.

31.    **CTS's** former place of business was located at 8209-8211 3rd Avenue Brooklyn, New York 11209, and is an entity-victim of the *association-in-fact enterprise(s)*.

32.    **George F. LLC.,** is a privately held New York corporation, owned by its sole shareholder Georgette **Franzone** and having its former place of business located at 8209-8211 3rd Avenue in the Brooklyn, New York, and is an entity-victim of the *association-in-fact enterprise(s)*.

33.     **G. Lifestyle Spa LLC.,** is a privately held New York corporation, owned by its sole shareholder **Georgette Franzone** and having its former place of business located at 8209-8211 3rd Avenue in the Brooklyn, New York, and is an entity-victim of the *association-in-fact Enterprise(s)*.

34.     **Georgette Franzone** is a resident of the State of Florida, and is an individual-victim of the *association-in-fact enterprise(s)*.

## RICO Person Defendants Association-in-Fact Conspirators in 18 U.S.C § 1961 Acts

35.     *RICO Defendant,* **Violette Tonuzi** whose primary/current place of business is  6911 Shore Road #1 Brooklyn, New York 11209, is a *RICO Person,* within the meaning of RICO, 18 U.S.C. §1961(3) and is acting as a principle within the meaning of 18 U.S.C. §2, acting distinct from the *association-in-fact enterprise(s)* lawful operations and is in charge of the day-to-day affairs-operations of the *illegal enterprise(s) schemes*.

36.     *RICO Defendant,* **Violette Tonuzi Salon** and **Day Spa** whose primary/current place of business is,  6911 Shore Road #1 Brooklyn, New York 11209, is a *RICO Person,* within the meaning of RICO, 18 U.S.C. §1961(3) and is acting as a principle within the meaning of 18 U.S.C. §2, acting distinct from the *association-in-fact enterprise(s)* lawful operations and is in charge of the day-to-day affairs operations of the *illegal  enterprise(s) schemes*.

37.     That the defendant **Juan Tejera ("Tejera")** was and is an agent servant employee retained in the capacity as a New York City Police Officer and by his position of authority to arrest a policy maker for the City of New York acting under the color of the law, and was otherwise subject to the jurisdiction of this Court;  is a *RICO Person,* within the meaning of RICO, 18 U.S.C. §1961(3) acting as a principle within the meaning of 18 U.S.C. §2; and was/is a member of the *NYPD* **Enterprise** and the *association-in-fact Enterprise(s)* who was aware of and did assist in the day-to-day operations of the illegal activity alleged herein; was/did knowingly and intentionally conspire with the other *RICO Person Defendants* where he has by his conduct assisted in the unlawful affairs of the *NYPD* **Enterprise** and the *Enterprise(s)* schemes in violation of Plaintiff Franzone's constitutional and civil rights by the unlawful seizure of Plaintiff's Property by means of extortion as a New York City Police Officer.

38.     That the defendant **James Grant ("Grant")** was and is an agent servant employee retained in the capacity as a New York City Police Officer and by his position of authority to arrest a policy maker for the City of New York acting under the color of the law, and was otherwise subject to the jurisdiction of this Court;  is a *RICO Person,* within the meaning of RICO, 18 U.S.C. §1961(3) acting as a principle within the meaning of 18 U.S.C. §2; and was/is a member of the *NYPD* **Enterprise** and the *association-in-fact Enterprise(s)* who was aware of and did assist in the day-to-day operations of the illegal activity alleged herein; was/did knowingly and intentionally conspire with the other *RICO Person Defendants* where he has by his conduct assisted

in the unlawful affairs of the **NYPD Enterprise** and the **Enterprise(s)** schemes in violation of Plaintiff Franzone's constitutional and civil rights by the unlawful seizure of Plaintiff's Property by means of extortion as a New York City Police Officer.

39.    That the defendant **Joseph Trischitta ("Trischitta")** was and is an agent servant employee retained in the capacity as a New York City Police Officer and, by his position of authority to arrest, a policy maker for the City of New York acting under the color of the law, and was otherwise subject to the jurisdiction of this Court;  is a **RICO Person**, within the meaning of RICO, 18 U.S.C. §1961(3) acting as a principle within the meaning of 18 U.S.C. §2; and was/is a member of the **NYPD Enterprise** and the **association-in-fact Enterprise(s)** who was aware of and did assist in the day-to-day operations of the illegal activity alleged herein; was/did knowingly and intentionally conspire with the other **RICO Person Defendants** where he has by his conduct assisted in the unlawful affairs of the **NYPD Enterprise** and the **Enterprise(s)** schemes in violation of Plaintiff Franzone's constitutional and civil rights by the unlawful seizure of Plaintiff's Property by means of extortion as a New York City Police Officer.

40.    That the defendant **William Masso ("Masso")** was and is an agent servant employee retained in the capacity as a New York City Police Officer and, by his position of authority to arrest, a policy maker for the City of New York acting under the color of the law, and was otherwise subject to the jurisdiction of this Court;  is a **RICO Person**, within the meaning of RICO, 18 U.S.C. §1961(3) acting as a principle within the meaning of 18 U.S.C. §2; and was/is a member of the **NYPD Enterprise** and the

*association-in-fact Enterprise(s)* who was aware of and did assist in the day-to-day operations of the illegal activity alleged herein; was/did knowingly and intentionally conspire with the other **RICO Defendants** where he has by his conduct assisted in the unlawful affairs of the **NYPD Enterprise** and the *association-in-fact Enterprise(s)* in violation of Plaintiff Franzone's constitutional and civil rights by the unlawful seizure of Plaintiff's Property by means of extortion as a New York City Police Officer.

     41.   That the defendant **Hanna Tonuzi Alverez, ("Alverez")** was an agent servant employee retained in the capacity as a New York City Police Officer and by her use of her former position acting under the color of law with active New York City Police Officers, and was otherwise subject to the jurisdiction of this Court;  is a **RICO Person**, within the meaning of RICO, 18 U.S.C. §1961(3) acting as a principle within the meaning of 18 U.S.C. §2; and was/is a member of the **NYPD Enterprise** and the *association-in-fact Enterprise(s)* aware of and did assist in the day-to-day operations of the illegal activity alleged herein; was/did knowingly and intentionally conspire with the other **RICO Person Defendants** where she has by her conduct assisted in the unlawful affairs of the **NYPD Enterprise** and the *association-in-fact Enterprise(s)* in violation of Plaintiff Franzone's constitutional and civil rights by the unlawful seizure of Plaintiff's  Property by means of extortion as a New York City Police Officer.

     42.   That the defendant **Ann Guerin, ("Guerin")** was and is an agent servant employee retained in the capacity as a New York City Police Officer and by his position of authority to arrest a policy maker for the City of New York acting under the color of

the law, and was otherwise subject to the jurisdiction of this Court;  is a ***RICO Person,*** within the meaning of RICO, 18 U.S.C. §1961(3) acting as a principle within the meaning of 18 U.S.C. §2; and was/is a member of the ***NYPD*** **Enterprise** and the ***association-in-fact Enterprise(s)*** aware of and did assist in the day-to-day operations of the illegal activity alleged herein; was/did knowingly and intentionally conspire with the other ***RICO Person Defendants*** where she has by her conduct assisted in the unlawful affairs of the ***NYPD*** **Enterprise** and the ***association-in-fact Enterprise(s)*** in violation of Plaintiff Franzone's constitutional and civil rights by the unlawful seizure of Plaintiff's Property by means of extortion as a New York City Police Officer.

43.     That the Defendant **Liliana Narbone ("Narbone")** is a resident of the State of New Jersey;  is a ***RICO Person,*** within the meaning of RICO, 18 U.S.C. §1961(3) acting as a principle within the meaning of 18 U.S.C. §2; and was/is a member  the ***association-in-fact Enterprise(s)*** aware of and did assist in the day-to-day operations of the illegal activity alleged herein; was/did knowingly and intentionally conspire with the other ***RICO Defendants*** where she has by her conduct assisted in the unlawful affairs of the ***association-in-fact Enterprise(s)***  and ***NYPD Enterprise*** in violation of Plaintiff Franzone's constitutional and civil rights by the unlawful seizure of Plaintiff's Property by means of extortion in aid/ assistance of the New York City Police.

44.     That the Defendant **Farije Tonuzi-Sheridan, ("Sheridan")** is a resident of the State of New Jersey;  is a ***RICO Person***, within the meaning of RICO, 18 U.S.C. §1961(3) acting as a principle within the meaning of 18 U.S.C. §2; and was/is a member

the *association-in-fact Enterprise(s)* aware of and did assist in the day-to-day operations of the illegal activity alleged herein; was/did knowingly and intentionally conspire with the other *RICO Defendants* where she has by her conduct assisted in the unlawful affairs of the *association-in-fact Enterprise(s)* in violation of Plaintiff Franzone's constitutional and civil rights by the unlawful seizure of Plaintiff's Property by means of extortion in aid/ assistance of the New York City Police.

45.     That the defendant **Frankie Alverez, ("F. Alverez")**  was an agent servant employee retained in the capacity as a New York City Police Officer and by her former use of her former position acting under the color of law with active New York City Police Officers, and was otherwise subject to the jurisdiction of this Court;  is a *RICO Person,* within the meaning of RICO, 18 U.S.C. §1961(3) acting as a principle within the meaning of 18 U.S.C. §2; and was/is a member of the *NYPD* **Enterprise** and the *association-in-fact Enterprise(s)* aware of and did assist in the day-to-day operations of the illegal activity alleged herein; was/did knowingly and intentionally conspire with the other *RICO Person Defendants* where he has by his conduct assisted in the unlawful affairs of the of the *NYPD* **Enterprise** and the *association-in-fact Enterprise(s)* in violation of Plaintiff Franzone's constitutional and civil rights by the unlawful seizure of Plaintiff's  Property by means of extortion as a New York City Police Officer.

46.     That the defendant Hanna "Anna" Tonuzi Alvarez, **("H. Alverez")**  was an agent servant employee retained in the capacity as a New York City Police Officer and by her former use of her former position acting under the color of the law with active

- 15 –

New York City Police Officers, and was otherwise subject to the jurisdiction of this Court; is a **RICO Person**, within the meaning of RICO, 18 U.S.C. §1961(3) acting as a principle within the meaning of 18 U.S.C. §2; and was/is a member of the **NYPD Enterprise** and the **association-in-fact Enterprise(s)** aware of and did assist in the day-to-day operations of the illegal activity alleged herein; was/did knowingly and intentionally conspire with the other **RICO Person Defendants** where he has by his conduct assisted in the unlawful affairs of the **NYPD Enterprise** and the **association-in-fact Enterprise(s)** in violation of Plaintiff Franzone's constitutional and civil rights by the unlawful seizure of Plaintiff's Property by means of extortion as a New York City Police Officer

**Defendants in Negligence and/or Breach of Contract:**

47.  **Progressive Credit Union** is Corporation doing business in the State of New York with offices at 131 West 33rd Street, 7th Fl. New York, New York 10001.

48.  **Mary Carbone ("Carbone")** is a resident of the State of New York residing at 8121-3rd Avenue Brooklyn, New York 11209.

49.  **Frank Carigliano ("Carigliano")** is a resident of the State of New York residing at 8121-3rd Avenue Brooklyn, New York 11209.

50.  **Hedda Schacter ("Schacter")** is a resident of the State of New York residing at 880 5th Avenue #20A New York, New York 10021,.

51.     C. Elias Enterprise Inc., d/b/a Charles Elias Salon and Spin Salon, ("Spin") is a Corporation doing business in the State of New York with offices at 131 West 33rd Street, 7th Fl. New York, New York 10001.

52.     The **City Of New York ("City")** is a municipal corporation established pursuant to the provisions of §20 of the General City Law and is the governmental body having the powers and duties set forth in the General City Law and the Municipal Home Rule, and is otherwise subject to the jurisdiction of this Court.

53.     John Doe and/or Jane Roe, Plaintiff does not currently know the true names of defendant DOE(s) and ROE(s) 1 through 10.  However, Plaintiff will seek leave of the court to amend this Complaint by alleging the true names and capacities of defendants, Does 1 through 10 when they are ascertained.

### FORMATION-PURPOSE-RELATIONSHIP SCHEME-DISTINCTIVENESS LONGEVITY OF ASSOCIATION-IN-FACT-ENTERPRISES

**RICO Formation-Purpose**:

54.     During the Relevant Period commencing in or about June 2002, *RICO Person Defendant* **Tonuzi** and Elias entered into an agreement for the express purpose of illegally gaining control of the assets of **CTS** by removal of the rights and privileges belonging to its preferred Shareholder **Franzone.**

**Relationship-Scheme:**

55.     The *RICO Person Defendants* and others, under the cover of the *RICO Enterprise* and of the *NYPD* **Enterprise** have committed a *continuous* series of well-

planned and *related* criminal acts affecting *alike-similar victims* who believed they would provide their funding and business resources for the benefit of a joint venture with **CTS**.

56.  In performance of their scheme the ***RICO Person Defendants*** willfully, intentionally and falsely misrepresent that their contractual agreements for revenues would be ongoing and involve a continuing future relationships between them when in fact the relationship were intended not to exist in the manner claimed and were designed to provide an opportunity for organized illegal activity so as to allow the ***RICO Person Defendants*** to acquire or maintain an interest in, or control over the enterprise through a pattern of racketeering activity; where the defendant(s) conspired to, conducted or participated in the affairs of the enterprise through their pattern of racketeering activity intending to do the acts described hereafter.

**Distinctiveness:**

57.  At times ***RICO Person Defendant***, Tonuzi and Elias or Tonuzi and Sheridan are/were the hub of the illegal ***RICO Enterprise*** and conspired with the ***NYPD Enterprise*** which was used to accomplish the racketeering activities.

58.  From their positions as members of the ***RICO Enterprise*** they operated and control the affairs and interaction of the ***RICO Enterprise*** members.

59.  ***RICO Person Defendants*** are distinct from the ***RICO Enterprise Entities*** and have conspired and are using at various times one or several of the ***RICO Enterprise Entities*** and the ***NYPD Enterprise*** for the purpose of performing the illegal scheme hereafter outlined.

60.     Some of the **RICO Person Defendants** have maintained a continuing cycle of interstate theft using their agreements with other defendants to operate the **RICO Enterprise and NYPD Enterprise** which has, as intended, caused injury to Plaintiffs' Business-Property.

61.     And, although the **RICO Person Defendants** often appear to be interacting or performing in their lawful-fiduciary capacities with the individual **RICO Enterprise Entities and NYPD Enterprise,** they are in reality acting in furtherance of the collective **RICO Person Defendants** scheme for the benefit of the **RICO Person Defendants** alone, and so as to injure Plaintiffs in their Business-Property.

**Longevity:**

62.     The scheme is singular in purpose involving interrelated multiple exploits with similar victims and has been carried out on multiple occasions over a period in excess of 12 years through the continuing relationships forged among the **RICO Person Defendants** and includes the ongoing criminal activity which exists to this date and will continue into the future causing injury to Plaintiffs' Business-Property.

**AGREEMENT TO COMMIT OVERT ACTS**

63.     In the performance and execution of the scheme in one of multiple overt acts designed to maintain the affairs of the **RICO Enterprise Entities and NYPD Enterprise, RICO Person Defendants** agreed to commit the overt acts hereafter set forth.

64.     In the performance and execution of the scheme, the **RICO Person Defendant** **Tonuzi** and **Elias** agreed and are using **CTS** as the money laundering arm of

the **RICO Enterprise** used to funnel the capital and assets into the **RICO Entities** Violette

Tonuzi Salon and Day Spa, and C. Elias Enterprise Inc., d/b/a Charles Elias Salon and Spin Salon

for their own us.

### AGREEMENT TO COMMIT PREDICATE ACTS OF RACKETEERING

65.    The scheme and its control has been to date accomplished in performance of the

racketeering activity as agreed among the **RICO Person Defendants** by means of

electronically-telephonically circulating false, misleading and incomplete statements to

Plaintiffs the Courts and others.

66.    In each instance, the **RICO Person Defendants** knew and were aware of the

false-misleading and/or incomplete nature of the information provided and otherwise

omitted material information which was needed to make the statements truthful fully

knowing that each of the Plaintiffs and the Boards of the **RICO Enterprise Entities** would

rely on those statements in support of the companies' lawful operations which has allowed

the **RICO Person Defendants** to conceal and continue their illegal acts in the affairs-

operations of the **RICO Enterprise Entities.**

67.    Each statement and document was material to the manner in which the **RICO

Person Defendants** obtained control of Plaintiffs' Business-Property and then controlled the

affairs of the **RICO Enterprise** in their continued cycle of illegal conduct.

68.    Since at least June 2002, the **RICO Person Defendants** have by agreement, on

multiple occasions, intentionally and knowingly committed, assisted or otherwise ratified the

scheme by using mail and wire transmissions intending to injure Plaintiffs' Business-Property

directly and indirectly using-controlling the **RICO Enterprise Entities** where they have, independent of the initial racketeering activities **via electronic means,** fraudulently claimed the right of ownership to Plaintiffs' Business-Property and fraudulently obtained control of the operations of the Plaintiffs' Business-Property by means linking the pattern of racketeering activity in a manner intended to accomplish the goals of the **RICO Person Defendants.**

69.    In performance of the scheme the **RICO Person Defendants** obtained non-competition agreements to control Plaintiffs and cause the delivery of their business relationships to the **RICO Person Defendants**; where any agreement made with Plaintiffs were intentionally breached-defaulted and made worthless on the part of the **RICO Person Defendants** in the scheme to defraud Plaintiff of their Business and Property.

## FACTUAL BACKGROUND

70.    At all times material hereto, Plaintiff **Franzone** was a successful business venture capitalist engaged in advertising as well as private project funding, including real estate investing and personal services businesses.

71.    At all times material hereto, in or about March 1999, Plaintiff **Franzone** was approached by **Tonuzi, Elias** and Robert Cavale, a former shareholder of **CTS** for assistance in financing a new salon at a new location, wherein they each agreed to give Plaintiff **Franzone** a small percentage of the new salon as and for payment of her services.

72.    Shortly after the undertaking Plaintiff **Franzone** discovered that the **RICO Defendants** and Cavale were not credit worthy and, that without a co-signor and secured

collateral for the **RICO Defendants** and Cavale, would be unable to obtain funding for a new salon.

73.     In response to her findings, Plaintiff **Franzone** in or about March 1999, contacted Tonuzi, Elias and Cavale, each separately over the telephone making inquiry about their lack of credit and past due payments to creditors.

74.     In response thereto, in or about March 1999, Tonuzi, Elias and Cavale stated to **Franzone** over the telephone and in response to her inquires that the location and size of the salon they were working from was not sufficient in size to support their "books" and/or "chairs" and that they were forced to turn away customers; which meant they were losing income; according to **Tonuzi** it was "feast or famine".

75.     Over the course of the next several months **Tonuzi,** Elias and Cavale were unable to obtain funding wherein they approached Plaintiff **Franzone** for a bridge loan in anticipation of financing.

76.     At all times material hereto, **Franzone** agreed to provide the loan to **Tonuzi,** Elias and Cavale only upon the terms of their starting a new company and only so long she was issued preferred shares with the exclusive right to have her shares redeemed by the company at a stated sum of $7,500 plus 8% interest from 2002 forward.

77.     At all times material hereto, **CTS** was established as a closely held New York sub-S corporation.

78.     Plaintiff **Franzone** owns 100% of the preferred shares, and 28.33 shares of the former shareholder Cavale.

79.     Defendant **Tonuzi** owns 28.33% and **Elias** owns 15% of the issued and outstanding shares of the Company.   There are an additional 28.34% being held in Treasury.

80.     At **Franzone**'s election, she alone, could either cash out on the stated value of her preferred shares under the foregoing formula, or she could have the business appraised and receive four (4) times net revenue.

81.     Under the Corporate Charter each of the principles was a designated officer of the company and each shareholder was required to vote  in a specific manner:

> **ELECTING DIRECTORS.** The parties individually agree with each that **at all meetings of the shareholders** of the Corporation for the purpose of electing directors, so long as the individual parties to this agreement are the owners and holders of all the authorized, issued and outstanding common shares of the Corporation, **they will vote all the shares standing in their names at all times for the election of each other as directors of the Corporation** so as to perpetuate and maintain the management and sole control of the business of the Corporation in the individual parties thereto. **[Emphasis added.]**

> **ELECTING OFFICERS.** The parties individually agree with each other **at all meetings held for the purpose of electing officers that they agree to vote for the election of each other as officers** of each of the Corporations as follows:

> President — Robert
> Vice President — Charlie
> Secretary — Georgotte
> Treasurer — Violette
> **[Emphasis added.]**

82.     That at all times material hereto, **Franzone** demanded that the business properly report its cash income under generally accepted accounting principles,

("GAAP") file taxes and operate under all of the terms of the shareholders, management agreement, and the law.

83.     It was also **Franzone's** right to assume a paid position to manage the new company and assist opening any additional locations.

84.     It was agreed that as and for their shareholder consideration, **Tonuzi,** Elias and Cavale would each become an employee of the new company, receive a salary; turnover all tips to the company; irrevocably assign their individual clientele; all of the good will of the business from their prior location; and enter into non-competition-non solicitation agreements containing certain use and geographic restrictions.

85.     It was the Parties' intent to increase shareholder wealth and ultimately allow **Tonuzi,** Elias and Cavale to purchase **Franzone's** shareholder interest at the above referenced formula or sell the business to a third-party.

86.     At all times material hereto, **Franzone** advised **Tonuzi,** Elias and Cavale that unless she was placed in management in a paid position of authority she would walk away from the deal.

87.     At all times material hereto, ***RICO Person Defendant*** **Tonuzi,** Elias and Cavale agreed to the terms aforesaid and otherwise agreed to enter into a Shareholders' Agreement containing the foregoing terms including **Franzone's** management agreement with **CTS.**

88.     Under **Franzone**'s agreements she prepared business plans needed for funding, supervised the financial statements and all applications.

89.     In or about July 2000, so as to obtain funding for the build out of the new salon, by reason of her efforts Plaintiff **Franzone** obtained a loan commitment for **CTS** wherein **Tonuzi** and Cavale were to be the primary borrowers in the principle sum of $625,000.00 from Defendant **Progressive.**

90.     At all times material hereto, **Progressive** required **Franzone** and Elias to be guarantors of the loan and allow a lien against the assets-fixtures of **CTS**.

91.     The terms of the loan required **Tonuzi** to provide a mortgage to **Progressive** as against her family property located at 155 Jefferson Avenue, Cresskill New Jersey.

92.     At all times material hereto, **Tonuzi** agreed and provided a mortgage to her family property located at 155 Jefferson Avenue, Cresskill New Jersey as security for the loan.

93.     At all times material hereto, **Progressive** also required Plaintiff **Franzone** to agree and to provide a mortgage to her property located at 423 W 23rd Street Manhattan, New York as security of to the loan.

94.     At all times material hereto, **Franzone** agreed and provided a mortgage to her family property located at 423 W 23rd Street Manhattan, as security for the loan.

95.     On about July 11, 2000, **CTS** borrowed the principle sum of $625,000.00 from Defendant **Progressive** wherein on or about that date **Progressive** was required to file its security interest-mortgage liens against each of these properties.

96.    At all times material hereto, **Franzone** worked on the design of the **CTS** with the architects and worked daily overseeing the contractors; she negotiated all the terms for the vendors and designed and wrote all the communications including press releases.

97.    At all times material hereto, **Franzone** worked on the premises training all staff on the computers, overseeing all ordering, human resources, payroll, and overall appearance of the Spa; working on displays, advertising, promotion and all customer service. She designed the website, menus, business card, gift cards all communications to the public.

98.    At all times material hereto **Franzone** created and otherwise managed a staff consisting from-time-to time of 2 Salon Managers, 5 to 6 Check Out-Booking Agents, 12-15 Hairstylists, 4-6 Hair Assistants, a Spa Manger, 4 Massage therapist, 2 Manicurists, 2 Estheticians, an Office Admin. officer and 2 Janitorial positions.

99.    At all times material hereto, by reason of her efforts, **Franzone** had created a profitable entity turning the **CTS** into a prestigious boutique salon with a well-known and respected reputation within the industry and throughout the community.

100.    Unbeknownst to **Franzone** or Cavale, just as the company was growing, **Tonuzi** and Elias started to realize the value of **CTS** and began setting the pace for nothing less than the theft-conversion-embezzlement of the business' income, wherein they entered into an agreement-plan, to make it falsely appear the business was not profitable.

101.   The scheme operated by **Tonuzi** and Elias involved skimming cash income from the business and was intended to eliminate the shareholder value of both Cavale and **Franzone** so as to drive them out of the business and assume direct control of the business for themselves.

102.   Unbeknownst to Cavale, or Plaintiff **Franzone**, since the initial startup of **CTS, Tonuzi** and Elias had been using **CTS** as a facade for serial income tax evasion and other forms of benefit theft committed by them.

103.   That in furtherance of the scheme, on or about March 2003, **Tonuzi** and Elias contacted **Franzone** over the telephone falsely advising **Franzone** that they wanted to shift their chair times to be together during certain business hours so that they could take advantage of working together during peak customer hours.

104.   That in furtherance of the scheme, on or about March 2003 and during that telephone conversation, **Tonuzi** told **Franzone** that she herself would act to supervise the staff and that **Franzone** would to take the alternative shifts.

105.   At all times material hereto, the real purpose of the telephone call was to allow **Tonuzi** and Elias to be on the premises together without **Franzone** being present to oversee their illegal activities.

106.   At all times material hereto, **Franzone** hired Dawn Cavale, the wife of Robert Cavale, as a floor manager engaged to oversee the activities of **CTS** employees and their interaction with clients during those shifts she was not present.

107.   At or about this time, Dawn Cavale advised **Franzone** that several of the employees including **Tonuzi** and Elias, were not following the established business practices-agreements related to accurate tip reporting and believed that **Tonuzi** and Elias were skimming from the register.

108.   Upon hearing this information in order to combat the effects of the illegal scheme **Franzone** issued a work place memorandum advising employees that under the GAAP provision required by the **CTS** agreements and as required by the **CTS** accountants, tips are to be reported as a portion of an employee's income.

109.   That at all times material hereto, **Tonuzi** and Elias became irritated about Dawn Cavale's reporting the withholding of tips and other activities and seeing an opportunity to further their plan, fully knowing this would irritate Cavale, they contacted **Franzone** over the telephone and demanded that **Franzone** fire her.

110.   At all times material hereto, **Franzone** refused to fire Dawn Cavale and demanded that **Tonuzi** and Elias properly report their tips as income and fully report all cash activities.

111.   In furtherance of their goal to eliminate the shareholder interest of **Franzone** and Cavale, in or about 2001, **Tonuzi** began to intentionally argue with the Cavales and was becoming increasingly abusive to Robert Cavale and his wife.

112.   At all times material hereto, by reason of the abuse, the Cavales were forced to leave the business due to the intentional and constant friction created by **Tonuzi** and Elias, wherein **Franzone** purchased Robert Cavale's shareholder interest.

113.   Once Cavale was gone, **Tonuzi** and Elias set the next phase of their scheme into action.   In part, according to the agreement between **Tonuzi** and **Elias** the scheme became more aggressive; there was a continued failure to report tips and an escalation in skimming money from the cash flow of the business.

114.   At all times material hereto, the scheme worked such that when **Franzone** would arrive at work 40-50 % of the cash proceeds would be unaccountable for expense and income tax withholding.

115.    In response to the **Franzone's** inquiries about the lack of cash, **Tonuzi** and Elias each falsely insisted that they were hiring independent contractors and that they had to make payments directly from the register or the individuals would not work.

116.   At all times material hereto, although they had agreed to abide by GAAP reporting requirements, in furtherance of the scheme **Tonuzi** and Elias failed to keep proper records and proof of the payments; failed to withhold deductions or even confirm social security numbers for 1099's.

117.   At all times material hereto, **Tonuzi** and Elias knew and were aware that the foregoing conduct made it impossible to create and maintain an accurate in house record keeping source for data entry and review and sale of the company or Franzone's shares.

118.    At all times material hereto, **Tonuzi** and Elias in furtherance of the scheme were not hiring independent contractors and were skimming/embezzling cash from **CTS.**

119.   In or about 2003, the IRS conducted a field audit and issued an official warning to **CTS** finding that the Company was not properly reporting income-gratuities. The IRS directed the company to report and account for all income and gratuities.

120.   By reason of the IRS audit Plaintiff became aware that **Tonuzi** and Elias were **still not** reporting or depositing their individual cash income-gratuities into the company.

121.   After **Franzone** learned of the IRS determination, she confronted both **Tonuzi** and Elias over the telephone reminding them that on repeated occasions **Franzone** and **CTS** accountants warned **Tonuz**i and Elias to stop this practice.

122.   During this telephone conversation **Franzone** demanded that **Tonuzi** and Elias stop their illegal activities, demanded that they comply with the IRS directives, and account for lost profits to the business wherein, if they did not, she would fire them.

123.   In response thereto, **Tonuzi** and Elias recognized that they would be limited to income in the form of common shareholder revenue and knowing otherwise stated to **Franzone** that they would each leave and take their clients with them.

124.   At all times material hereto, **Franzone** reminded them that they had assigned their clientele to **CTS** and agreed in writing not to compete or solicit **CTS** Clients and that if they violated the terms of their agreements with **CTS**, she would get a Court order against them.

125.   In response, Defendants **Tonuzi** and **Elias** denied any wrongdoing and continued to falsely claim they had spent the cash on hiring hairstylists as independent contractors.

126.   In 2003, a capital investment call was made by **Franzone** due to the loss of Cavale's leaving **CTS** and by reason of the skimming/embezzlement of **CTS** by **Tonuzi** and Elias.  Capital was needed by **CTS** for its bills and for salaries to employees.

127.   In response to the need for cash **Franzone** contacted **Tonuzi** and Elias over the telephone and advised them that by reason of Cavale's departure and the alleged cash payments to the "independent contractors" **CTS** was forced to make a capital call for contribution, wherein **Franzone** demanded that **Tonuzi** and Elias contribute a pro-rata share of the needed capital further advising them that if they could not meet the capital call their shares would be sold or otherwise diluted by new investment income and that she would at the expiration of  90 days place **CTS** and her shares for sale.

128.   Both **Tonuzi** and Elias advised **Franzone** that they could not meet the capital call and could not afford to purchase her shares pursuant to the terms of the Shareholders' Agreement, wherein **Franzone** advised them that she would not infuse capital and would place **CTS** with a broker for the immediate sale of the business.

129.   At all times material hereto, **Tonuzi** and Elias knew they did not have the money to purchase **Franzone's** shares and were angered by **Franzone's** demand to sell the **CTS** in the open market wherein, as against the **CTS** shareholders' formula **Franzone** would take most if not all of the profit from any sale of **CTS.**

130.   Over the course of the next several days Defendants **Tonuzi** and Elias agreed, conspired and planned among themselves to force **Franzone** out of **CTS** and

began to commit certain overt and predicate acts willfully intending to sabotage her business interest and otherwise eliminate her ability to sell **CTS** in the market.

131.   At all times material hereto, in furtherance of their plan, fully knowing they would not honor or abide by the terms of their written Agreements  with **CTS** and otherwise honor any promises to **Franzone,** on or about August 11 of  2003, **Tonuzi** and Elias called a telephonic Board meeting wherein they falsely advised **Franzone** that **CTS** and **Franzone** could rely on their promises to comply with all the tax reporting requirements and disclose all tips as income; wherein each falsely stated to **Franzone** during said telephone conversation that they would each abide by the terms of their written Agreements.

132.  At all times material hereto, unbeknownst to **Franzone,** although Defendants **Tonuzi** and Elias had agreed to abide by the terms of their Agreements, thereafter, in contravention of the law, the Shareholder's Agreement, as well as their fiduciary obligations and oral commitments reaffirming their loyalty, defendants **Tonuzi** and Elias ' in several overt and predicate acts intending to execute their plan by illegally running the affairs of **CTS,** began to strategically and deliberately interfere with **CTS** operations  in the performance of the scheme to defraud- control, convert and otherwise misappropriate Plaintiff **Franzone's** shares, Defendants **Tonuzi** and **Elias** committed multiple criminal acts.

133.   In response to the promises of **Tonuzi** and **Elias, Franzone** agreed to sell her Manhattan home to raise capital for **CTS** wherein **Franzone** demanded personal

guarantees from **Tonuzi** and Elias and, on or about September 1, 2003, received a promissory note in the sum of $162,000, signed by both **Tonuzi** and **Elias.**

134. At all times material hereto, **Franzone,** in reliance on the belief the **Progressive** loan and **CTS** were secured by the **CTS** assets and **Tonuzi** mortgage, paid down $75,000 of the SBA **Progressive** Loan, and infused fresh working capital in the sum of $75,000.00 into the **CTS** operating accounts.

135. At all times material hereto, this calculation has been confirmed by using the service-dollars as calculated by Salon Biz based on the GAAP anticipate of gratuities.

136. At all times material hereto, while **Tonuzi** and Elias falsely agreed to comply with reporting their income and gratuities, it was not too long after that they retreated to their old ways.

137. For instance, each would take drawer entries to pay for personal items inclusive of dry cleaning, dinners, lunches, prescriptions and gas. The skimming also included the sale of gift certificates to customers wherein payment was paid by the customer, most often in cash, or by check wherein said checks were deposited to their personal bank accounts in names of **Tonuzi** and Elias.

138. At all times material hereto, **CTS** never received the payment but provided the services once the gift certificate was presented.

139. In yet another scheme, unbeknownst to **Franzone** at the time, in or about December 2005, and continuing into January 2006, Defendant **Elias** with the permission,

knowledge and consent of **Tonuzi** engaged in multiple singular commissions of credit card fraud via electronic transmission.

140.   At all times material hereto, while using the **CTS** credit card processor in transmission between **CTS** and its processor-bank, Elias, not only for himself but for other employees of **CTS,** allowed clients to charge gratuities as a service fee.

141.   At all times material hereto, the foregoing activity was in furtherance of the scheme and a fraud on **CTS** wherein **CTS** was paying service fees sales tax on the gratuities and the participants were avoiding the duty to report the income.

142.   This violated **CTS's** credit card license and cost **CTS** not only service tax of 6.25% but credit card processing fees as well at 2.5%.

143.   In yet another violation of the credit card agreement Defendant **Elias** used the **CTS** terminal and charged a large sum [$10,000.00] onto his personal credit card and then took the cash from the register again causing **CTS** not only service tax of 6.25% but credit card processing fees as well at 2.5%.

144.   By reason of this fraudulent conduct the credit card company shut down his card and the company almost lost its processing benefits because of his actions.

145.   At all times material hereto, the schemes were employed over a number of years using different variations wherein these gratuities, as payment as a service income, cost the **CTS** in excess of $300,000.00 over a 9 year period.

146.   Likewise, **Tonuzi's** and **Elias's** sales of gift cards, while keeping the cash and when the customers would redeem them and have to pay the cost whether through payroll or products, cost **CTS** an additional $150,000.00 in actual losses.

147.   At all times material hereto for the reason of the continued embezzlement and in an attempt to stop the illegal activities of **Tonuzi** and Elias, **Franzone** installed an ATM machine on the **CTS** premises wherein the installation stopped the forgoing credit card improprieties.

148.   In response thereto, Defendant Elias threatened **Franzone** with physical assault further threatening to destroy the ATM machine, wherein **Franzone** was frightened and filed a police report.

149.   By reason of the continuing theft **CTS** was again in need of cash and, in July 2005, so as to save the business and prevent having to place **CTS** into bankruptcy, **Franzone** provided additional capital.

150.   At all times material hereto, a second note was prepared wherein **Tonuzi** and Elias agreed to a personal guarantee. The Note was prepared to represented additional capital investments in the amount of $220,000.00 and executed by Elias on behalf of both himself and **Tonuzi**.

151.   At all times material hereto, the conduct of **Tonuzi** and Elias, as intended, financially crippled the **CTS** wherein **Franzone** continued to try and grow the business hoping to get to a point of growth where she could recover her investment.

152.   When Defendants became frustrated at **Franzone's** efforts to eliminate their embezzlement, **Tonuzi** refused to work a full-time schedule showing up 2-3 days a week and instead, in violation of the Shareholder's Agreement, worked for **CTS** clients servicing them from her home.

153.   At all times material hereto, when **Tonuzi** in furtherance of the scheme would come to work again, wherein, in violation of the Shareholder's Agreement, she made a regular practice of under charging her clients or waiving their fees to encourage unreported cash payments directly to her.

154.   While Plaintiff **Franzone** was exercising her business judgment, attempting to mainstream the company and increase the wealth of its shareholders, meaning she was recording cash transactions, making employees properly report wages and otherwise comply with the state and federal taxing authorities, defendants **Tonuzi** and Elias were continuing to divert cash from the business, refusing to allow Plaintiff to properly report income tax-wage and profits.

155.   In November 2006, Elias, who was in New York in furtherance of the illegal conduct and in a predicate act of racketeering activity in violation of the law, via the electronic transmission of the message, and in a follow-up telephone conversation with **Franzone** who was in Florida, demanded that **Franzone** stop reporting income to the taxing authorities.

156.   Despite their best efforts, the company under Plaintiff **Franzone's** watch showed a profit in 2007 requiring **Tonuzi** and Elias to report additional income.

157.   This was the breaking point for the Defendants.  **CTS** actually had to report profits-income, meaning **Tonuzi** and Elias had to pay taxes on their income which was reported at over $100,000.00.

158.   At or about this time **Franzone** announced she had enough and was placing **CTS** on the market if her shareholder interest and promissory notes were not paid.

159.   Between **Franzone's** shareholder interest, based on the schedule provided for in the Shareholders' Agreement at the established rate of interest, of 8% the value of Plaintiff's shares, which in or about July 2007 was in excess of $364,427.71, with an additional sum due on her Notes in excess of $500,000.00; the total due **Franzone** was approximately $864,447.71.

160.   In response to her demand for a buyout and to further their illegal goals Defendant **Tonuzi** and Elias, conspired to place **CTS** into dissolution, believing they could liquidate the company where they would then be free to take back-solicit their former clientele and reopen a new salon within the geographically restricted area as provided for under the **CTS** Shareholders' Agreement.

161.   Not realizing that the preferred shareholder **Franzone** had rights superior to theirs, and believing they would be free to take the assets of **CTS** and simply use them in their own new businesses in August 2007, pursuant to §1104-a of the Business Corporation Law, in the face of being cut off by the credit card companies and running out of opportunity to divert cash from the company and for the reason that they were forced to declare a profit to the IRS, Defendant Elias filed a petition to dissolve **CTS.** *Matter of*

_Charbei Elia.s v. Cavale Tonuzi Corp._

162.   The dissolution action was falsely and intentionally premised upon the claim that **Franzone** was guilty of illegal, fraudulent and oppressive actions toward Elias and **Tonuzi.**

163.   Notwithstanding the fact that under the corporate charter and a separate management agreement Plaintiff **Franzone** was responsible for the day-to-day operations of the company, Elias' petition falsely claimed that Plaintiff made it impossible for **Tonuzi** and Elias to make decisions relating to finances, banking, payroll, staffing, bookkeeping, accounting, legal issues and other day-to-day functions of the business.

164.   Thereafter, on or about October 23, 2007, by way of summary judgment motions in lieu of complaint, Plaintiff **Franzone** commenced two (2) separate actions for recovery of the money owed her on her Notes. _George F LLC v. C'harbei "Charlie" El/as Ca vale, & Tonuzi Corp.,_ under Kings County Supreme Court Index No. 40593/07. The other action is titled _Georgette Frazone v. Charbel "Charlie" El/as avaiç Tiolette Tonuzi & Tonuzi Corp.,_ under Kings County Supreme Court Index No. 40594/07.

165.   Both actions were brought to recover sums due pursuant to Promissory Notes, in the amount in excess of $500,000.00; wherein **Tonuzi** and Elias were and remain personally liable.

166.   On or about August 23, 2007, **Tonuzi** and Elias discovered that if the dissolution were to go forward under a Plan of Dissolution **Franzone** would be treated as the sole preferred shareholder and that she would have the right to maintain all of the

good-chattels and good will of **CTS** including the company's clientele list, wherein the covenant not to compete would remain in effect even if the assets of **CTS** were sold to a third party.

167.   Fully knowing they could not repay the Notes or **Franzone's** shareholder interest, and that they would be unable to simply walk away with the assets of **CTS** in December 2008, **Tonuzi** and Elias entered into a settlement agreement with **Franzone** wherein they conspired among themselves and otherwise knew at the time that they would not honor the settlement agreement or abide by the Shareholder's Agreement, wherein each agreed that they would never give up their former clientele and that they would do what they could to cause **Franzone** to default under the Settlement Agreement including illegally solicit **CTS** clients and otherwise compete with **CTS**.

168.   The terms of the agreement provided that **Franzone** was to buy the shares of the remaining two shareholders **Tonuzi** and Elias, and then take control of the business.

169.   The agreement was made contingent upon the happening of two events; each to happen within the following 6 months:

> (1) **Franzone** was to obtain a lease extension for **CTS** and name change;
>
> (2) **Franzone** was to have removed and/or substitute the Progressive Credit Union loan collateralized by way of a mortgage against defendant **Tonuzi's** family property.

170.   Over the course of the next several months **Franzone** attempted to fulfill the conditions-terms of the Settlement Agreement.

171.   Between January 2009 and March 2009, Franzone was successful in obtaining the terms of a new lease agreement-assignment and deposited in excess of $60,000.00 into the Defendant Landlords' [**Mary Carbone, Hedda Schachter, Frank Corigliano**] attorney's trust account for delivery of the new lease.

172.   At about this time **Tonuzi** and Elias became aware of **Franzone's** progress and notwithstanding that the Shareholders' Agreement and terms of the Settlement Agreement, which remained in full force including the restrictive covenant which prohibited **Tonuzi** and Elias from competition in either the form of ownership or employment with another salon as limited to the Salon's geographic location, in or about January 2009, Elias began delivering threats of physical abuse towards **Franzone** claiming he would never let her keep his "clients".

173.   At all times material hereto, Police reports were filed concerning these matters.  Elias was told that if the abuse continued he would be arrested.

174.   Thereupon, in or about February 2009, Elias abandoned the corporation and in violation of his agreements began directly competing with **CTS** by his employment with and ultimate purchase of **Spin**-Salon at the location which was situated within the geographical restriction pertaining the non-competition solicitation terms of the Shareholders' Agreement.

175.   That at all times material hereto, notwithstanding ownership interest of the

Plaintiff in **CTS,** as well as the liens asserted by **Progressive**,  Elias falsely pledged the assets of **CTS** as collateral for a loan with the World Trade Center Small Business Recovery Fund  fully knowing that an action was pending to determine the lawfulness of his openly competing with **CTS** and that his use of **CTS** assets as prohibited under the **CTS** Shareholders' Agreement and the terms and conditions of the  **Progressive** loan.

176.  In furtherance of the theft, Elias took control of **CTS** assets and is directly competing with **CTS** in violation of the Shareholder's Agreement not to compete.

177.  Likewise, in or about January 2009, Tonuzi abandoned CTS wherein Defendant **Tonuzi,** while in open Court, admitted to servicing **CTS**-clients in her home and admitting to making in excess of $1,000.00 a week in violation of the Shareholders' Agreement and Settlement Agreement.

178.  These activities violated the **CTS** Shareholders' Agreement, the Settlement Agreement and directly diverted cash-income from **CTS.**

179.  At all times material hereto, **Franzone** served Defendant **Tonuzi** and Elias with written notice to stop diverting-soliciting clients and/or otherwise competing with **CTS** within the geographic limitation provided for under the Shareholders' Agreement, and under the terms of the settlement or face prosecution**.**

180.  At all times material hereto,  Defendant **Tonuzi** and Elias knew and were aware that if they were unable to compete with the geographic limitations of the **CTS** Agreements they would be unable to attract their former clients to a new location and

needed to cause **Franzone** to default on the Settlement Agreement, wherein in or about September 2009, via the telephone in furtherance of their scheme, **Tonuzi** and Elias in furtherance of their scheme contacted the landlords **Carbon, Carigiano**, and **Schacter** falsely advising and convincing them that **Franzone** was a thief and was going to be arrested by the Brooklyn District Attorney's Office for embezzling from **CTS.**

181.   Whereupon by reason of their false statements, the landlords improperly agreed to withhold the delivery of the new lease and improperly withheld Plaintiffs' funds in breach of their agreement to her in the amount of $60,000.00, refusing to return the funds to her.

182.   After illegally engaging in direct competition with **CTS**, in or about June 2009, **CTS/Franzone** served notice on **Tonuzi** and Elias to stop diverting-soliciting clients and/or otherwise competing with **CTS** within the geographic limitation provided for under the Shareholders' Agreement and under the terms of the settlement or face civil prosecution.

183.   At a time prior to September 23, 2009, notwithstanding the fact that there was a written Settlement Agreement and Shareholders' Agreement, **Tonuzi** and Elias knew and were aware that if the Court ruled that if they objected to the settlement in the December 2008 Settlement Agreement and it were adjudged valid they would be without the means to regain control of **CTS**.

184.   In furtherance of their illegal conduct and intending to intimidate **Franzone**, Defendant **Tonuzi** and Elias via the telephone, at a time prior to September 23, 2009, employed the aid and assistance of Defendant **Sheridan** who agreed to use her former

position as a New York City Police Officer to coordinate criminal acts in  furtherance of the criminal scheme to seize **CTS** from Plaintiffs  wherein, so as to insure Plaintiffs' illegal lockout, **Tonuzi** and Elias, with the knowledge and aid of **Sheridan**, contacted  members of the 68th Precinct who Sheridan knew where engaged in various criminal activities, the *RICO Defendants* of the *NYPD Enterprise*, who then agreed to assist  **Tonuzi** and Elias in the illegal seizure of  **CTS** and lock out **Franzone** from the **CTS** premises.

185.   On or about September 23, 2009, in furtherance of the scheme, the *RICO Defendants* of the *NYPD Enterprise*, at the direction of **Tonuzi, Elias and Sheridan,** and fully aware that **Tonuzi** and Elias were not entitled to possession of the **CTS** premises except as by Court order and having been told by them that they did not possess a court order for possession, through the use-abuse of the their positions as public servants  and through a pattern of extortion in violation of New York Penal Law 155.05(2)(e)(viii), engaged in conduct within-related to their official duties  as New York City Police Officers whereby Plaintiff *Franzone*  was threatened into surrendering her property-business.  The *RICO Defendants* of the *NYPD Enterprise* then physically locked **Franzone** out of the premises, illegally change the locks to the premises, and by telephonic communication on September 23, 2009, falsely advised **Franzone** that they had possession of a "COURT ORDER" as their authority for seizure and if she were to reenter the premises she would be arrested.  **Tonuzi,** Elias and **Sheridan** were allowed to take physical possession and control of **CTS.**

186.   At all times material hereto, thereafter and for a period of in excess of two weeks, commencing September 30, 2009 and each day thereafter, the *RICO Defendants*

of the **NYPD Enterprise** provided "Around-the-clock security" . . . . to ensure that if **Franzone** were to resort to self-help and seek to regain possession of the premises they would restrain her. *Franzone* was subsequently and repeatedly banned from her property-business through the continued conduct of the **RICO Defendants** of the **NYPD Enterprise**, affecting her business-property adversely and causing pecuniary loss.

187.   At all times material hereto, **Franzone** was in fear of arrest and harm for her physical safety.

188.   At all times material hereto, thereafter upon the complaint of **Franzone,** the New York City Police Department Internal Affairs Bureau communicated to **Franzone** on June 2011 their findings that the acts of the **RICO Defendants** of the **NYPD Enterprise** who conspired with Defendants **Tonuzi,** Elias and **Sheridan**, violated the procedures, practices, and customs of the New York City Police Department and further acknowledged the violations to Plaintiff's constitutional and civil rights by removal of her without a court order.

189.   In response to the forgoing illegal seizure and lockout, Plaintiff presented two orders-to-show cause to the Court-Madam Justice Demarest presiding, each requesting a preliminary injunction for the illegal acts of **Tonuzi** and Elias setting forth the claims involving the illegality committed by the **NYPD Enterprise**.

190.   In response thereto, fully knowing they were engaging in offering sworn testimony to be relied on by the Court, **Tonuzi** and Elias, each fully knowing that **Franzone** was paying advances made by George F and G. LifeStyle Spa, did submit

affidavits wherein each did willfully and falsely accuse **Franzone** of embezzling funds from **CTS,** mailing copies to **Franzone** and her Counsel.

191.   **Tonuzi** and Elias submitted the false claims and accusations so as to remain in control of **CTS** and divide the assets among themselves.

192.   During this time and in furtherance of their illegal conduct and intent to intimidate **Franzone**, Defendants **Tonuzi** and Elias employed the aid and assistance of Defendant **Narbone,** a **<u>known and convicted counterfeiter</u>**, in two coordinated criminal acts.


193.   In furtherance of the criminal scheme to seize **Franzone's** property, prior to the illegal lockout, **Narbone,** at the request of **Tonuzi** and Elias filed a civil action against **Franzone** wherein **Narbone** falsely claimed that **Franzone** had executed a certain promissory note in the amount of $100,000.00, and wherein **Narbone** tendered a forged promissory note with her complaint claiming that the note bore **Franzone's** signature demanding payment due of $100,000.00 plus interest.

194.   Thereafter, **Narbone** demanded summary judgment on the note. The Court denied the motion for summary judgment as an obvious forgery and ordered a discovery schedule.

195.   On March 30, 2010, the Court-Justice Demarest  issued an order denying Plaintiff **Franzone** a preliminary injunction in the case bearing Index No.25674/2009 and directing **Tonuzi** and Elias to maintain the status quo.

196.   That at all times material hereto, the Court directed a discovery schedule and ordered a trial on the contested issues of fact.

197.   That at all times material hereto, despite the order of the Court directing **Tonuzi** and Elias to maintain the status quo, **Tonuzi** and Elias intentionally used the Court's order to further the efforts of the illegal scheme by transferring assets to the companies **Spin** and **VTS.**                .

198.   Subsequent to the illegal lockout **Tonuzi** and Elias, in furtherance of their scheme, with the knowledge and aid of **Narbone** and **Sheridan, Sheridan** arranged to again use her position as a former police officer so as to cause the false arrest of the **Franzone** on the Complaint of **Narbone.**

199.   At all times material hereto, on or about April 2, 2010, **Sheridan** via telephonic communication, contacted a former colleague of hers, ***RICO Defendant*** for the ***NYPD Enterprises*** **New York City Police Officer JuanTejera**.

200.   At all times material hereto, Sheridan requested his assistance in having him arrest **Franzone** on the false Complaint of **Narbone** explaining to **Tejera** that **Franzone** was causing problems for her sister with **CTS** and had to be dealt with.

201.   At all times material hereto, **Narbone,** in furtherance of the **Enterprises,** with the full knowledge that she was conspiring with **Tonuzi**, Elias and **Sheridan,** did file a false report for the arrest of **Franzone** with the Midtown South Precinct containing a sworn deposition wherein said deposition contained knowingly and intentionally false statements concerning **Franzone** that would have **Franzone**

falsely arrested.

202.   At all times material hereto, **Tejera** agreed to assist Sheridan and requested the assistance of **Guerin,** advising **Guerin** of the conspiracy wherein each agreed to assist.   Intending to place **Franzone** in a false light with the Court, **Tejera,** with the knowledge and at the request of **Tonuzi,** Elias and **Sheridan,** presented himself in the Courtroom before Judge Demarest on a scheduled appearance date in the **Franzone** matters and, without a warrant, advised the Court of his intended arrest of **Franzone,** falsely advising the Court that the arrest was based on the complaint of **Narbone.**

203.   At all times material hereto, the intent was to inflame and otherwise prejudice the Court towards **Franzone** in the disposition of her claims in the collection of the debts owed by them to **CTS** and **Franzone.**

204.   At all times material hereto, **Franzone** became aware of the pending arrest on the false claim of **Narbone** and sought the aid of the Brooklyn District Attorney's Office.

205.   That the aforesaid District Attorney's Office began an investigation into the matter and despite their demands <u>directing New York City Police Officer **Tejera** not to arrest Plaintiff on the claims of **Narbone**,</u> the directive was intentionally ignored so as to aid/assist the *Enterprises* wherein, on April 23, 2010, **Franzone** was falsely arrested by **Tejera** and his partner **Guerin**.

206.   At all times material hereto, **Franzone** spent in excess of 30 hours in custody without charges ever being filed.

207.   That in or about May 2012, the actions brought by **Narbone** and the **Franzone** were deemed ready for trial, with a trial date of September 11, 2012 for the **Narbone** case and September 21, 2012 for the other **Franzone** matters.

208.   At all times material hereto, in the face of committing perjury or otherwise subjecting herself to prosecution for uttering a forged instrument, **Narbone** withdrew her claims against **Franzone** with prejudice.

**The Intentional  Default On The Progressive Loan and CTS-Franzone Claims**

209.   At all times material hereto, after unlawfully seizing **CTS, Tonuzi** and Elias intentionally and willfully failed to maintain the status quo as directed under the holdings set forth in the March 30, 2010 order of Justice Demarest.

210.   That at all times material hereto, **CTS** had sufficient income to meet its obligations in repayment of the loan to **Progressive** and for payout of **Franzone's** claims.

211.    At all times material hereto, although **Tonuzi** and Elias were in control and physical possession of the business, and despite the available income, the numerous demands from **Progressive** for a work out and the pending actions of **Franzone** for payment of her notes and shares**,** Defendant **Tonuzi** and Elias simply ignored **Progressive's** and **Franzone's** demands for payment and intentionally defaulted on the **Progressive** loan and otherwise proceeded to systematically convert the assets  of **CTS** into the operations of **VTS** and **Spin.**

212.    At all times material hereto, Defendants **Tonuzi** and Elias knew and

were aware that if they never responded to the demands of **Progressive** for a work-out and payment on the loan, that the loan would result in a default judgment.

213.   At all times material hereto, Defendants **Tonuzi** and Elias knew and were aware that if **Franzone** got to trial she would recover a judgment against them in excess of $900,000.00, wherein **Tonuzi** and Elias agreed that **Tonuzi** would hide her assets with her family including altering the paperwork and transfer her family property located at 155 Jefferson Avenue, Cresskill, New Jersey as mortgaged to **Progressive** and pledged to **CTS** into the names of **Hanna Alverez** and **Frank Alverez,** leaving **Progressive, CTS** and **Franzone** without a means to collect their debt.

214.   At all times material hereto, Defendants **Hanna Alverez** and **Frank Alverez** knew and were aware of the mortgage obligation to family property located at 155 Jefferson Avenue, Cresskill, New Jersey as mortgaged to **Progressive,** under the **CTS** and **Tonuzi** loan obligations.

215.   At all times material hereto, upon information and belief, **Progressive** failed to properly/timely file its mortgage or otherwise record a UCC as against said property as required under the terms of the loan agreement.

216.   At all times material hereto, Defendant **Tonuzi** knew and was aware that **Progressive** failed to properly record the aforesaid lien and in or about 2010 and via telephone requested the assistance of **Hanna Alverez** and **Frank Alverez** in the transfer of the family property located at 155 Jefferson Avenue, Cresskill, New Jersey as

mortgaged to **Progressive,** under the **CTS** and **Tonuzi** loan obligations out of her name and into their names wherein said defendant intending to eliminate the loan obligations of **Tonuzi** and the collateral liens owed to **Franzone** and **Progressive** filed a knowingly false deed as the new owners of the property never disclosing the **Progressive** lien.

217.   In or about January 2011, **Progressive** ultimately commenced an action for which they were awarded a judgment of $337.619.89 against, **Tonuzi, Elias**, **CTS** , Cavale and **Franzone.**

218.   At all times material, from in or about the year 2000, and continuing to date, **Tonuzi** has diverted **CTS** assets to **VTS** and **Elias** has diverted said assets to **CE-Spa** causing injury to Plaintiff's business and property.

## PREDICATE ACTS OF THE *NYPD ENTERPRISE*

219.   **New York City Police Officer Juan Tejera**

220.   By falsely arresting the Plaintiff, *RICO Defendant* **Police Officer Juan Tejera** intended to further an endeavor by the *RICO Defendants* employed by the *NYPD Enterprise*, who operated-managed the *NYPD Enterprise* by using the police powers bestowed upon them by that enterprise, through a pattern of extortion in violation of New York Penal Law 155.05(2)(e)(viii), whereby the Plaintiff was threatened into surrendering and being repeatedly banned from her property-business through the use-abuse of the RICO Defendants' positions as public servants who engaged in conduct within-related to their official duties in such manner as to affect the

Plaintiff adversely. The Plaintiff thereby suffered injury to her business-property by reason of the pattern of extortion.

221.   **New York City Police Captain James Grant**

222.   By participating in and supervising over the extortion of the Plaintiff, ***RICO Defendant* Police Captain James Grant** intended to further an endeavor by himself and the other ***RICO Defendants*** employed by the ***NYPD Enterprise***, who operated-managed the ***NYPD Enterprise*** by using the police powers bestowed upon them by that enterprise, through a pattern of extortion in violation of New York Penal Law 155.05(2)(e)(viii), whereby the Plaintiff was threatened into surrendering and being repeatedly banned from her property-business through the use-abuse of the ***RICO Defendants'*** positions as public servants who engaged in conduct within-related to their official duties in such manner as to affect the Plaintiff adversely. The Plaintiff thereby suffered injury to her business-property by reason of the pattern of extortion.

223.   **New York City Police Officer Ann Guerin**

224.   By falsely arresting the Plaintiff, ***RICO Defendant* Police Officer Ann Guerin** intended to further an endeavor by the ***RICO Defendants*** employed by the ***NYPD Enterprise***, who operated-managed the ***NYPD Enterprise*** by using the police powers bestowed upon them by that enterprise, through a pattern of extortion in violation of New York Penal Law 155.05(2)(e)(viii), whereby the Plaintiff was threatened into surrendering and being repeatedly banned from her property-business through the use-abuse of the ***RICO Defendants'*** positions as public servants who

engaged in conduct within-related to their official duties in such manner as to affect the Plaintiff adversely. The Plaintiff thereby suffered injury to her business-property by reason of the pattern of extortion.

225. **New York City Police Officer Hanna "Anna" Tonuzi Alvarez**

226. By communicating, coordinating and participating with the *RICO Defendants* employed by the *NYPD Enterprise*, *RICO Defendant* **Police Officer Hanna "Anna" Tonuzi Alvarez** intended to further an endeavor by herself and the other *RICO Defendants* employed by the *NYPD Enterprise*, who operated-managed the *NYPD Enterprise* by using the police powers bestowed upon them by that enterprise, through a pattern of extortion in violation of New York Penal Law 155.05(2)(e)(viii), whereby the Plaintiff was threatened into surrendering and being repeatedly banned from her property-business through the use-abuse of the *RICO Defendants'* positions as public servants who engaged in conduct within-related to their official duties in such manner as to affect the Plaintiff adversely. The Plaintiff thereby suffered injury to her business-property by reason of the pattern of extortion.

227. **New York City Police Officer Frank "Frankie" Alvarez**

228. By communicating, coordinating and participating with the *RICO Defendants* employed by the *NYPD Enterprise*, *RICO Defendant* **Police Officer Frankie "Frank" Alvarez** intended to further an endeavor by himself and the other *RICO Defendants* employed by the *NYPD Enterprise*, who operated-managed the *NYPD Enterprise* by using the police powers bestowed upon them by that enterprise,

through a pattern of extortion in violation of New York Penal Law 155.05(2)(e)(viii), whereby the Plaintiff was threatened into surrendering and being repeatedly banned from her property-business through the use-abuse of the **RICO Defendants'** positions as public servants who engaged in conduct within-related to their official duties in such manner as to affect the Plaintiff adversely. The Plaintiff thereby suffered injury to her business-property by reason of the pattern of extortion.

229. **New York City Police Officer Farije Tonuzi Sheridan**

230. By communicating, coordinating and participating with the ***RICO Defendants*** employed by the ***NYPD Enterprise***, ***RICO Defendant*** **Police Officer Farije Tonuzi-Sheridan** intended to further an endeavor by herself and the other **RICO Defendants** employed by the ***NYPD Enterprise***, who operated-managed the ***NYPD Enterprise*** by using the police powers bestowed upon them by that enterprise, through a pattern of extortion in violation of New York Penal Law 155.05(2)(e)(viii), whereby the Plaintiff was threatened into surrendering and being repeatedly banned from her property-business through the use-abuse of the ***RICO Defendants'*** positions as public servants who engaged in conduct within-related to their official duties in such manner as to affect the Plaintiff adversely. The Plaintiff thereby suffered injury to her business-property by reason of the pattern of extortion.

231. **New York City Police Officer Joseph Trischitta**

232. By participating in the extortion of the Plaintiff, ***RICO Defendant*** **Police Officer Joseph Trischitta** intended to further an endeavor by himself and the other

*RICO Defendants* employed by the **NYPD Enterprise**, who operated-managed the **NYPD Enterprise** by using the police powers bestowed upon them by that enterprise, through a pattern of extortion in violation of New York Penal Law 155.05(2)(e)(viii), whereby the Plaintiff was threatened into surrendering and being repeatedly banned from her property-business through the use-abuse of the ***RICO Defendants'*** positions as public servants who engaged in conduct within-related to their official duties in such manner as to affect the Plaintiff adversely. The Plaintiff thereby suffered injury to her business-property by reason of the pattern of extortion.

233.   **New York City Police Officer Marco Venezia**

234.   By participating in the extortion of the Plaintiff, ***RICO Defendant* Police Officer Marco Venezia** intended to further an endeavor by himself and the other ***RICO Defendants*** employed by the **NYPD Enterprise**, who operated-managed the **NYPD Enterprise** by using the police powers bestowed upon them by that enterprise, through a pattern of extortion in violation of New York Penal Law 155.05(2)(e)(viii), whereby the Plaintiff was threatened into surrendering and being repeatedly banned from her property-business through the use-abuse of the ***RICO Defendants'*** positions as public servants who engaged in conduct within-related to their official duties in such manner as to affect the Plaintiff adversely. The Plaintiff thereby suffered injury to her business-property by reason of the pattern of extortion.

235.   **New York City Police Officer William Masso**

236.   By participating in the extortion of the Plaintiff, *RICO Defendant* **Police Officer William Masso** intended to further an endeavor by himself and the other *RICO Defendants* employed by the *NYPD Enterprise*, who operated-managed the *NYPD Enterprise* by using the police powers bestowed upon them by that enterprise, through a pattern of extortion in violation of New York Penal Law 155.05(2)(e)(viii), whereby the Plaintiff was threatened into surrendering and being repeatedly banned from her property-business through the use-abuse of the *RICO Defendants'* positions as public servants who engaged in conduct within-related to their official duties in such manner as to affect the Plaintiff adversely. The Plaintiff thereby suffered injury to her business-property by reason of the pattern of extortion.

237.   **New York City Police Officer John Doe and/or Jane Roe**

238.   By participating in the extortion of the Plaintiff, *RICO Defendant* **Police Officers John Doe and/or Jane Roe** intended to further an endeavor by themselves and the other *RICO Defendants* employed by the *NYPD Enterprise*, who operated-managed the *NYPD Enterprise* by using the police powers bestowed upon them by that enterprise, through a pattern of extortion in violation of New York Penal Law 155.05(2)(e)(viii), whereby the Plaintiff was threatened into surrendering and being repeatedly banned from her property-business through the use-abuse of the *RICO Defendants'* positions as public servants who engaged in conduct within-related to their official duties in such manner as to affect the Plaintiff adversely. The Plaintiff thereby suffered injury to her business-property by reason of the pattern of extortion.

*   *   *   *

## Causes of Action
## Count I.
## Violations of 18 U.S.C. § 1962(a)
## *(RICO Defendants Tonuzi and Elias)*

239.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "216"  with the same force and effect as though set forth herein.

240.   The **Tonuzi** and **Elias** *Enterprises,*  are a devise, a Scheme or artifice used to defraud Plaintiffs and others for the purpose of executing such Schemes or artifices or attempting to do so, where the **Tonuzi** and **Elias** *Enterprises,* constitutes *associations-in-fact* as that term is defined in 18 U.S.C. 1961(3).

241.   *RICO Person Defendants* **Tonuzi** and **Elias** are members/owners and/or officers-employees of the **CTS,  Spin** and **VTS** the (**Tonuzi** and **Eliase Enterprise**) who, are each acting independent of their offices and acting in the capacity of *"Person"* distinct from the **Tonuzi** and **Elias Enterprises** where each have illegally laundered the money invested by Plaintiffs **Franzone, George F. and G-Spa** converting or otherwise embezzling the assets of **CTS** and launder them into **VTS** and **Spin** where they used the proceeds of their theft to put **CTS** out of business, and are using the stolen assets of **CTS** in the day-to-day operation of **VTS** and **Spin** in the unlawful operations which have injured **CTS** and **Franzone** in their business and property.

242.   The **RICO Person Defendants** did not merely reinvest in the same entity-**CTS,**  but rather they are using the converted assets which were obtained by predicate acts of racketeering activity in performance of the acts constituting the formation of the **Tonuzi** and **Elias** *Enterprise* as it exists today.

243.   The theft-embezzlement-conversion and subsequent reinvestment of the stolen assets-funds was committed in a manner designed to avoid detection of the **RICO Person Defendants** criminal activities and accomplished by using the facilities and powers of the mail and wire services where a pattern of racketeering activity exists and has affected interstate commerce in the combined cover of the **Tonuzi** and **Elias** *Enterprises.*

244.   The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5). The acts were in violation of 18 U.S.C. §2; 18 U.S.C. §371; 18 U.S.C. § 1341-1343; 18 U.S.C. §§ 1951, 1956, 1957; 18 U.S.C. §§ 1962 (a), (b) and (c) and 18 U.S.C. §§ 2314-2315; grand larceny in violation of Organized Crime Control Act, N.Y. Penal Law §§ 460.00-.80, 155.05(e) iv, viii and ix, New York State Penal Law §§ 155.35-155.42 as indictable felony offenses  punishable by more than one year of incarceration, conduct which constitutes common law fraud-misrepresentation, conspiracy, conversion, aiding and abetting, breach of contract, and unjust enrichment.

245.   By reason of the foregoing  **RICO Defendants'** racketeering activities in violations of 18 U.S.C. §1962(a), and but for these illegal acts, Plaintiffs would not

have been damaged, including the loss of investments, loss of corporate opportunities for profit and the usurpation of those opportunities which has been caused by the attendant profits to the ***RICO Defendants*** causing losses to **CTS** and **Franzone** in the conduct of the **Tonuzi** and **Elias** *Enterprise*, with the resulting injury to their businesses and property in the case of  **CTS**  an actual sum in excess of $ 2,000,000.00 and in the case of **Franzone-George F., and G-Spa** a sum in excess of $900,000.

246.  By reason of, and but for the foregoing, the ***RICO Defendants*** actions have been illegal willful and outrageous and undertaken with reckless indifference to the rights of Plaintiffs, and as such Plaintiffs are entitled to treble damages as provide by  18 U.S.C. 1964(a).

### Count II.
### Violations of 18 U.S.C. § 1962(b)
### *( Defendants Tonuzi-Elias and Tonuzi-Sheridan)*

247.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "224", with the same force and effect as though set forth herein.

248.  The fraud in the manner accomplished in the removal of the Preferred Shareholder's was maintained and controlled by enterprises through a pattern of racketeering activity.

249.  The **Defendants Tonuzi-Elias and Tonuzi-Sheridan** *Enterprise Entities* are the vehicles used by the ***RICO Defendants*** to directly or indirectly, operating or

managing the affairs of the enterprise through a continuing pattern of racketeering activity through the Schemes and acts perpetrated against Plaintiffs.

250.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5). The acts were in violation of 18 U.S.C. §2; 18 U.S.C. §371; 18 U.S.C. § 1341-1343; 18 U.S.C. §§ 1951, 1956, 1957; 18 U.S.C. §§ 1962 (a), (b) and (c) and 18 U.S.C. §§ 2314-2315; grand larceny in violation of Organized Crime Control Act, N.Y. Penal Law §§ 460.00-.80, 155.05(e) iv, viii and ix, New York State Penal Law §§ 155.35-155.42 as indictable felony offenses  punishable by more than one year of incarceration, conduct which constitutes common law fraud-misrepresentation, conspiracy, conversion, aiding and abetting, breach of contract, and unjust enrichment.

251.    By reason of the foregoing  *RICO Person Defendants'* racketeering activities in violations of 18 U.S.C. §1962(b), and but for these illegal acts, Plaintiffs would not have been damaged, including the loss of investments, loss of corporate opportunities for profit and the usurpation of those opportunities which has been caused by the attendant profits to the *RICO Person Defendants* causing losses to **CTS** and **Franzone** in the conduct of the **Tonuzi** and **Elias** *Enterprise.*, with the resulting injury to their businesses and property in the case of  CTS an actual sum in excess of $ 2,000,000.00 and in the case of **Franzone-George F., and G-Spa** a sum in excess of $900,000.

252.    By reason of, and but for the foregoing, the *RICO Defendants* actions have been illegal willful and outrageous and undertaken with reckless indifference to the rights of Plaintiffs, and as such Plaintiffs are entitled to treble damages as provide by  18 U.S.C. 1964(b).

## Count III.
### Violations of 18 U.S.C. § 1962(c)
### *( Defendants Tonuzi-Elias, Tonuzi-Sheridan, NYPD Enterprises)*

253.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "230", with the same force and effect as though set forth herein.

254.   The **Tonuzi-Elias, Tonuzi-Sheridan, and** *NYPD Enterprises* are the vehicles used by the ***RICO Person Defendants*** who associated with the ***Enterprises*** and ***NYPD Enterprise*** who are directly or indirectly, operating or managing the affairs of the enterprises through a pattern of racketeering activity

255.   The ***RICO Person Defendants*** violated 18 U.S.C. § 1962(c) by directly or indirectly conducting or participating in the conduct-affairs of the ***Enterprises and NYPD Enterprise*** through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding Plaintiffs in a manner which affects interstate commerce.

256.   The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5). The acts were in violation of 18 U.S.C. §2; 18 U.S.C. §371; 18 U.S.C. § 1341-1343; 18 U.S.C. §§ 1951, 1956, 1957; 18 U.S.C. §§ 1962 (a), (b) and (c) and 18 U.S.C. §§ 2314-2315; grand larceny in violation of Organized Crime Control Act, N.Y. Penal Law §§ 460.00-.80, 155.05(e) iv, viii and ix, New York State Penal Law §§ 155.35-155.42 as indictable felony offenses  punishable by more than one year of incarceration, conduct which constitutes common law fraud-misrepresentation, conspiracy, conversion, aiding and abetting, breach of contract, and unjust enrichment.

257.  By reason of the foregoing, ***RICO Person Defendants'*** racketeering activities in violations of 18 U.S.C. §1962(c), and but for these illegal acts, Plaintiffs would not have been damaged, including the loss of investments, loss of corporate opportunities for profit and the usurpation of those opportunities which has been caused by the attendant profits to the ***RICO Person Defendants*** causing losses to **CTS** and **Franzone** in the conduct of the ***Enterprises and NYPD Enterprise***, with the resulting injury to their businesses and property in the case of  **CTS**  an actual sum in excess of $2,000,000.00 and in the case of **Franzone-George F., and G-Spa** a sum in excess of $900,000.

258.  By reason of, and but for the foregoing, the *RICO Person Defendants* actions have been illegal willful and outrageous and undertaken with reckless indifference to the rights of Plaintiffs, and as such Plaintiffs are entitled to treble damages as provide by  18 U.S.C. 1964(c).

**Count IV.**
**Violations of 18 U.S.C. § 1962(d)**
**\*(All RICO Defendants-Conspirators )\***

259.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "236" with the same force and effect as though set forth herein.

260.  All ***RICO Defendants*** in ***Enterprises*** and ***NYPD Enterprise*** intended to further an endeavor where the ***RICO Defendants*** of the ***NYPD Enterprise*** were employed by the ***NYPD Enterprise*** and operated-managed the ***NYPD Enterprise***

through a pattern of extortion in violation of New York Penal Law 155.05(2)(e)(viii), whereby the Plaintiff suffered injury to her business-property by reason of the pattern of extortion.

261.   In performance of the Scheme to defraud Plaintiffs, the **RICO Person Defendants** as principals knowingly, intentionally and unlawfully, aided and abetted, conspired and agreed with each other to commit at least two predicate acts of racketeering within the past ten years where as such their conduct constitutes a pattern of illegal activity as detailed heretofore above.

262.   The pattern of these illegal acts was performed by each of the **RICO Person Defendants** in such a manner and in each instance that such act was authorized or ratified by and done on behalf of the **RICO Person Defendants'** Scheme collectively and individually.

263.   The **RICO Defendants** agreed, combined and acted with a common plan to breach their fiduciary and other common-law duties owed to the **Enterprise Entities** by engaging in the unlawful acts described above.

264.   The **RICO Person Defendants** agreed, combined and acted with a common plan and purpose to defraud and embezzle money from Plaintiffs, and misappropriate the the **CTS** assets and other property, by engaging in the unlawful acts described above.

265.   The **RICO Person Defendants** committed overt acts, as described above, and conspired or otherwise agreed to indirectly or directly violate 18 U.S.C. §§ 1962 (a), (b) and (c).

266.   The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5). The acts were in violation of 18 U.S.C. §2; 18 U.S.C. §371; 18 U.S.C. § 1341-1343; 18 U.S.C. §§ 1951, 1956, 1957; 18 U.S.C. §§ 1962 (a), (b) and (c) and 18 U.S.C. §§ 2314-2315; grand larceny in violation of Organized Crime Control Act, N.Y. Penal Law §§ 460.00-.80, 155.05(e) iv, viii and ix, New York State Penal Law §§ 155.35-155.42 as indictable felony offenses  punishable by more than one year of incarceration, conduct which constitutes common law fraud-misrepresentation, conspiracy, conversion, aiding and abetting, breach of contract, and unjust enrichment.

267.   In the performance of the fraud the **RICO Defendants** devised a Scheme or artifice to defraud Plaintiffs and others for the purpose of executing such Scheme or artifice or attempting to do so in the theft of Plaintiffs' Property where the **RICO Defendants** caused to be placed on multiple occasions with an authorized carrier for delivery mail, containing knowingly false communications and things intended to accomplish the Scheme-goals of the **RICO Defendants**.

268.   A causal connection, however, only establishes that "but for" defendants' actions the plaintiffs would not have been incurred their injuries; by contrast, proximate causation requires an additional step -- that defendants' actions were a substantial factor in plaintiff's injuries and that those injuries were reasonably foreseeable to the defendants; thus, even if plaintiffs could establish but-for causation, that is not sufficient to establish proximate causation.

269.   By reason of the foregoing   **RICO Defendants'** racketeering activities in violations of 18 U.S.C. §1962(a) (b) and (c), and but for these illegal acts, Plaintiffs would not have been damaged, including the loss of investments, loss of corporate opportunities for profit and the usurpation of those opportunities which has been caused by the attendant profits to the **RICO Defendants** causing losses to **CTS** and **Franzone** in the conduct of the **Enterprises and NYPD Enterprise.**, with the resulting injury to their businesses and property in the case of  **CTS**  an actual sum in excess of $ 2,000,000.00 and in the case of **Franzone-George F., and G-Spa** a sum in excess of $900,000.

270.   By reason of, and but for the foregoing, the Defendants' actions have been illegal willful and outrageous and undertaken with reckless indifference to the rights of Plaintiffs, and as such Plaintiffs are entitled to treble damages as provide by 18 U.S.C. 1964(c); for violations of 1962 (a-b-c and d).

## Count V.
## Fraud-Misrepresentation
## *(Defendant Tonuzi)*

271.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "246", with the same force and effect as though set forth herein.

272.   At all times relevant hereto, in performance of the Scheme  to defraud **Franzone,** and  so as to induce **Franzone**  and cause her to enter into Agreements with them, on multiple occasions, as described heretofore the  Defendant, **Tonuzi**  and Elias knowingly and intentionally made false and material misrepresentations and omissions,

participated in one or more of the fraudulent Schemes as set forth above, and did both telephonically and by use of the U.S. mails falsely state to **Franzone** at one time or another as set forth above as to the truth of electronically dispatched documents, including the Shareholder Agreements, Progressive loan documents, and Settlement Agreement  which the Defendants **Tonuzi** and Elias knew were false-misleading or would become false by their intended conduct.

273.   The false statements, acts, misrepresentations, and material omissions of the Defendant **Tonuzi** and Elias as set forth above were designed and served to create and sustain a false reliance by Plaintiffs and intended to induce their reliance so as to gain in their consent and in the execution of these Agreements.

274.   By reason of the statements and in reliance of these documents Plaintiff entered into the foregoing Agreements.

275.   At all times material hereto, as intended the Defendant **Tonuzi** and Elias in violation of their fiduciary duties and common law duties, interfered with or otherwise caused the Agreements as executed to become worthless, which upon the terms agreed to, involved, or contained therein, became fraudulent, misrepresentation or omitted material information as set forth above so as to make them true.

276.   The Defendant **Tonuzi** and Elias knew or were reckless in not knowing of the material omissions and representations referred to herein.

277.  Had this information been truthfully and completely disclosed, the Defendant **Tonuzi** and Elias would have been unable to consummate the Agreements and gain control of Plaintiffs' property.

278.  The acts and omissions of the Defendants **Tonuzi** and Elias as set forth herein, constituted a Plans, Schemes and unlawful courses of conduct that have operated as a fraud and deceit Franzone and the other Plaintiffs, the purpose and effect of which was to induce Franzone to enter into the Agreement with the Defendants **Tonuzi** and Elias while the Defendants fraudulently and willfully planned to convert Plaintiffs property.

279.  By reason of, and but for the foregoing, the Defendants **Tonuzi** and Elias directly and indirectly committed fraud in that they: (a) employed devices, Schemes and artifices to defraud; (b) omitted/altered or failed to state material facts in the Agreement in order to make the Agreements-documents, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices in the course of business that operated as a fraud and deceit upon each Plaintiff.

280.  By reason of the foregoing Fraud-Misrepresentations and but for these wrongful and illegal acts, Plaintiffs would not have been damaged, including the loss of investments, loss of corporate opportunities for profit and the usurpation of those opportunities which has been caused by the attendant profits to the Defendants **Tonuzi** and Elias causing losses with the resulting injury to their businesses and property in the

case of **CTS** an actual sum in excess of $ 2,000,000.00 and in the case of **Franzone-George F., and G-Spa** a sum in excess of $900,000.

281.   By reason of, and but for the foregoing, the Defendants **Tonuzi** and Elias actions have been illegal willful and outrageous, immoral reprehensible wanton and undertaken with reckless or criminal indifference to the rights of Plaintiffs, and as such Plaintiffs are entitled to exemplary damages.

**Count VI.**
**Unjust Enrichment/Restitution**
**\*(Defendants Tonuzi VTS and Spin)\***

282.   Plaintiffs repeat, incorporate and otherwise allege by reference the allegations of paragraphs numbered "1"  through "257" above  of this Complaint as though fully set forth here and again.

283.   The Defendants **Tonuzi, VTS** and **Spin** has unjustly received financial gain and other business benefits at the expense of Plaintiffs through their wrongful conduct including her fraudulent conduct, breach of the Agreements and violations of the laws-Codes governing the conduct in relation to shareholders rights.

284.   By reason of, and but for the foregoing illegal conduct Defendants have illegally converting Plaintiffs' property.

285.    Defendants **Tonuzi, VTS** and **Spin** continue to unjustly retain these funds/assets at the expense of Plaintiffs.

286.   It would be unjust for these Defendants **Tonuzi, VTS** and **Spin** to retain any value they obtained as a result of their wrongful conduct.

287.   By reason of the foregoing  omissions, and but for these illegal acts, Plaintiffs would not have been damaged, including the loss of investments, loss of corporate opportunities for profit and the usurpation of those opportunities which has been caused by the attendant profits to the Defendant **VTS** and **Spin** causing losses to **CTS** and **Franzone, George F., and G-Spa** in the conduct of the Defendants **Tonuzi**  and Elias with the resulting injury to their businesses and property in the case of  **CTS**  an actual sum in excess of $ 2,000,000.00 and in the case of **Franzone-George F., and G-Spa** a sum in excess of $900,000.

288.   By reason of, and but for the foregoing, the Defendants **Tonuzi,  VTS** and **Spin** actions have been illegal willful and outrageous, immoral reprehensible wanton and undertaken with reckless or criminal indifference to the rights of Plaintiffs, and as such Plaintiffs are entitled to exemplary damages.

### Count VII.
### Unfair Competition
### *( Defendants Tonuzi, VTS and Spin)*

289.   Plaintiffs repeat, incorporate and otherwise allege by reference the allegations of paragraphs numbered "1"  through "264" above  of this Complaint as though fully set forth here and again.

290.   By virtue of the acts described above, the Defendants **Tonuzi, VTS** and **Spin** have committed fraud and theft, and otherwise misappropriated the property belonging to **Franzone** and her partners-**George F., and G. Lifestyles** and have

employed unfair and deceptive practices intended to interfere with the ability to fairly compete with **CTS**.

291.   Defendants **Tonuzi, VTS** and **Spin** have committed these acts maliciously and for the sole purpose of inflicting harm **Franzone** and her partners-**George F., and G. Lifestyles** or to benefit themselves at the expense of these Plaintiffs.

292.   By reason of the foregoing  omissions, and but for these illegal acts, Plaintiffs would not have been damaged, including the loss of investments, loss of corporate opportunities for profit and the usurpation of those opportunities which has been caused by the attendant profits to the Defendants **Tonuzi, VTS** and **Spin** causing losses to **CTS** and **Franzone** in the conduct of the **Tonuzi, VTS** and **Spin** with the resulting injury to their businesses and property in the case of  **CTS**  an actual sum in excess of $ 2,000,000.00 and in the case of **Franzone-George F., and G-Spa** a sum in excess of $900,000.

293.   By reason of, and but for the foregoing, the Defendants **Tonuzi, VTS** and **Spin,** actions have been illegal willful and outrageous, immoral reprehensible wanton and undertaken with reckless or criminal indifference to the rights of Plaintiffs, and as such Plaintiffs are entitled to exemplary damages.

### Count VIII.
### Breach of Duty of Fiduciary of Loyalty
### *( Defendant Tonuzi)*

294.  Plaintiffs repeat, incorporate and otherwise allege by reference the allegations of paragraphs numbered "1"  through "269"  above  of this Complaint as though fully set forth here and again.

295.   At all times material hereto, **Tonuzi** was an employee and/or officers/directors of **CTS.**

296.   By reason of her position of authority and control of **CTS** Defendant **Tonuzi** owed a fiduciary duty of loyalty to **CTS.**

297.   During their positions with **CTS Tonuzi** through her actions as set forth herein, intentionally and willfully violated her duties of loyalty to the **CTS** by taking actions contrary to the interest of **CTS**, including, but not limited to, diverting and usurping corporate opportunities in favor of herself; engaging in self-dealing, misrepresentations, fraud, and conspiracy, and competing with **CTS.**

298.   By reason of the foregoing  omissions, and but for these illegal acts, Plaintiffs would not have been damaged, including the loss of investments, loss of corporate opportunities for profit and the usurpation of those opportunities which has been caused by the attendant profits to the Defendant **Tonuzi** causing losses to **CTS** and **Franzone** in the conduct of the **Tonuzi Enterprises**, with the resulting injury to their businesses and property in the case of  **CTS**  an actual sum in excess of $ 2,000,000.00 and in the case of **Franzone-George F., and G-Spa** a sum in excess of $900,000.

299.   By reason of, and but for the foregoing, the Defendant **Tonuzi, and Elias,** actions have been illegal willful and outrageous, immoral reprehensible wanton and undertaken with reckless or criminal indifference to the rights of Plaintiffs, and as such Plaintiffs are entitled to exemplary damages.

## Count IX.
## Breach of Contract
## *(Defendant Tonuzi)*

300.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "275", with the same force and effect as though set forth in full herein.

301.   At all times material hereto, although **Tonuzi** agreed and otherwise promised to acts as fiduciary to **CTS** and **Franzone**, agreeing to secure the property located at 155 Jefferson Avenue, Cresskill, New Jersey by mortgage so as to obtain **Franzone's** guarantee of the loan and her business relations.

302.   In breach of her agreement with **Franzone, Tonuzi** failed or otherwise omitted and/or neglected to protect **Franzone** and **CTS** from loss and otherwise collateralize the debt obligation.

303.   The Agreements with Defendants **Tonuzi** was a binding obligation between her and Plaintiffs **Franzone** and **CTS**.

304.   At all times mentioned herein, Plaintiffs **Franzone** and **CTS** were in full compliance of their contractual obligations as set forth in those Agreements.

305.   Despite the clear contractual obligation of as set forth in those Agreements, Defendant **Tonuzi** failed or refused to perform and as a result has wrongfully breached her Agreements to **CTS** and **Franzone.**

306.   Defendant **Tonuzi** has no legal excuse for her breach of the Agreements, nor has any such excuse been offered or provided by her.

307.   By reason of the foregoing omissions, and but for these acts, Plaintiffs would not have been damaged, including the loss of investments, loss of corporate opportunities for profit and the usurpation of those opportunities.

308.   By reason of the foregoing, **CTS** and **Franzone** have sustained injury to their businesses and property in the case of **CTS** an actual sum in excess of $ 2,000,000.00 and in the case of **Franzone** a sum in excess of $900,000.

### Count X.
### Breach of Contract
### *(Defendant Progressive)*

309.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "284, with the same force and effect as though set forth in full herein.

310.   At all times material hereto, although **Progressive** agreed and otherwise promised to acts as fiduciary to **CTS** and **Franzone**, agreeing to secure the property located at 155 Jefferson Avenue, Cresskill, New Jersey by mortgage so as to obtain **Franzone's** guarantee of the loan.

311.   In breach of their agreement with **Franzone, Progressive** failed or otherwise omitted and/or neglected to secure the aforesaid property with a mortgage so as to protect **Franzone** and **CTS** from loss and otherwise collateralize the debt obligation.

312.   The Agreements with Defendants **Progressive** were binding obligations between them and Plaintiffs **Franzone** and **CTS**.

313.   At all times mentioned herein, Plaintiffs **Franzone** and **CTS** were in full compliance of their contractual obligations as set forth in those Agreements.

314.   Despite the clear contractual obligation of as set forth in those Agreements, Defendants**, Progressive** failed or refused to performed and as a result have wrongfully breached their Agreements to **CTS** and **Franzone.**

315.   Defendant **Progressive** has no legal excuse for their breach of the Agreements, nor has any such excuse been offered or provided by them.

316.   By reason of the foregoing omissions, and but for these acts, Plaintiffs would not have been damaged, including the loss of investments, loss of corporate opportunities for profit and the usurpation of those opportunities.

317.   By reason of the foregoing, **CTS** and **Franzone** have sustained injury to their businesses and property in the case of **CTS** an actual sum in excess of $ 2,000,000.00 and in the case of **Franzone** a sum in excess of $900,000.

### Count XI.
### Breach of Contract
### *(Defendants Mary Carbone, Hedda Schachter, Frank Corigliano)*

318.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "293", with the same force and effect as though set forth in full herein.

319.   At all times material hereto, **Mary Carbone, Hedda Schachter, Frank Corigliano** agreed in writing to provide a lease assignment to Plaintiffs **Franzone** and

**George F. LLC** and **G. Lifestyle,** so as to secure the **CTS** premises for their possession wherein **Franzone** paid **Mary Carbone, Hedda Schachter, Frank Corigliano** in excess of $60,000 for said lease.

320.   In breach of their agreement with **Franzone, Mary Carbone, Hedda Schachter, Frank Corigliano** failed or otherwise omitted and/or neglected to deliver the lease assignment to **Franzone.**

321.   **Franzone's** Agreement with Defendants **Mary Carbone, Hedda Schachter, Frank Corigliano** was a binding obligation between them and Plaintiffs **George F. LLC** and **G. Lifestyle.**

322.   At all times mentioned herein, Plaintiffs **Franzone** and **George F. LLC** and **G. Lifestyle** were in full compliance of their contractual obligations as set forth in those Agreements.

323.   Despite the clear contractual obligation of as set forth in those Agreements, Defendants**, Mary Carbone, Hedda Schachter, Frank Corigliano** failed or refused to performed and as a result have wrongfully breached their Agreements to **Franzone** and **George F. LLC** and **G. Lifestyle.**

324.   Defendant **Mary Carbone, Hedda Schachter, Frank Corigliano** have no legal excuse for their breach of the Agreements, nor has any such excuse been offered or provided by them.

325.   By reason of the foregoing omissions, and but for these acts, Plaintiffs would not have been damaged, including the loss of investments, loss of corporate opportunities for profit and the usurpation of those opportunities.

326.   By reason of the foregoing, **CTS** and **Franzone** have sustained injury to their businesses and property in the case of **CTS** an actual sum in excess of $ 2,000,000.00 and in the case of **Franzone** a sum in excess of $900,000.

**Count XII.**
**Intentional Infliction of Emotional Distress**
**\*(All RICO Person Defendant)\***

327.   Plaintiff repeats, re-alleges and otherwise incorporates each and every allegation as set forth in paragraphs "1" through "302" above, as though fully set forth here-at again.

328.   That the defendants intended and engaged in extreme and outrageous conduct; intending to cause, or disregard of a substantial probability of causing, severe emotional distress;  and there exist a causal connection between the conduct and injury; and severe emotional distress sustained by Plaintiff.

329.   By reason of the foregoing, Defendants are liable in damages to the Plaintiff for the unlawful consequences of their acts in a sum no less than $3,000,000.00.

330.   The aforementioned acts of defendants were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and justify the awarding of exemplary and punitive damages in the amount of $10,000,000.

## Count XIII.
## Conversion
## *( Defendants Tonuzi, Elias, Spin and/or VTS Doe 1-5 and Roe 1-5)*

331.   Plaintiffs hereby repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "306", with the same force and effect as though set forth herein.

332.   Plaintiffs each had a separate contractual relationship with the **CTS** and reasonably expected the terms and conditions therein to result in fulfillment of the benefits provided for under the Agreements.

333.   ***RICO Defendants* Tonuzi** and **Elias***,* in the operation and control the **Tonuzi** and **Elias** *Enterprises* in the Scheme to defraud Plaintiffs, wrongfully converted Plaintiff assets to their sole use and benefit all to the detriment of Plaintiffs in their business and property.

334.   By reason of the foregoing  omissions, and but for these illegal acts, Plaintiffs would not have been damaged, including the loss of investments, loss of corporate opportunities for profit and the usurpation of those opportunities which has been caused by the attendant profits to the Defendants **Tonuzi** and **Elias** causing losses to **CTS** and **Franzone** in the conduct of the **Tonuzi** and **Elias** *Enterprises*, with the resulting injury to their businesses and property in the case of  **CTS**  an actual sum in excess of $ 2,000,000.00 and in the case of **Franzone-George F., and G-Spa** a sum in excess of $900,000.

335.   By reason of, and but for the foregoing, the Defendants **Tonuzi, Elias,** actions have been illegal willful and outrageous, immoral reprehensible wanton and undertaken with reckless or criminal indifference to the rights of Plaintiffs, and as such Plaintiffs are entitled to exemplary damages.

**Count XIV.**
**Imposition of Constructive Trust**
***( Defendants Tonuzi, Elias, Spin and/or VTS Doe 1-5 and Roe 1-5)***

336.   Plaintiffs hereby repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "311" with the same force and effect as though set forth herein.

337.   *RICO Person Defendant* **Tonuzi,** and **Elias** and were  in a confidential and fiduciary relationship of trust and loyalty with each of the Plaintiff **Franzone**, wherein there were written Agreements providing a promise on the part of  to preserve the assets of **CTS** for its shareholders.

338.   Commencing in or about January 2000, *RICO Defendant* **Tonuzi,** and **Elias** together with **Doe 1-5** and/or **Roe 1-5** who are upon information and belief shareholders in **Spin and VTS** began to violate their duty of trust disregarding the Agreements with **Franzone** and began  to intentionally, willfully and with knowing aid of the reaming *RICO Defendants* to fraudulently convert the assets of **CTS.**

339. In furtherance of the Scheme to defraud **Franzone,** *RICO Person Defendant*, **Tonuzi,** and **Elias** together with **Doe 1-5** and/or **Roe 1-5** each individually,

are currently in possession, or will in the future come into possession, of funds-assets, which are rightfully the property of **CTS** operation of the ***Enterprises.***

340.   Neither the **Tonuzi,** and **Elias or Doe 1-5** and/or **Roe 1-5** have a legal right to hold and/or enjoy any such funds-assets in equity and good conscience, as such, any funds which are or will come into their  possession as a direct consequence of their Scheme and artifice to defraud Plainiffs.

341.   Plaintiffs will suffer irreparable harm and damage if Defendants **Tonuzi,** and **Elias and/or Doe 1-5 and Roe 1-5** are permitted to retain and use such funds-assets.

342.   Plaintiffs are entitled to the establishment of a constructive trust consisting of the benefit conferred upon Defendant **Tonuzi,** and **Elias or  Doe 1-5** and/or **Roe 1-5** by the revenues derived from their wrongful conduct, the expense of Plaintiff's cost of recovery and any and all profits derived from their wrongful conduct.

343.   Therefore, this Court should impose a constructive trust upon any such funds-assets, which trust should remain in effect until the final resolution of this matter.

**Count XV.**
**Appointment of Referee Injunctive Relief**
**\*( Defendants Tonuzi, Elias, Spin and/or VTS Doe 1-5 and Roe 1-5)\***

344.   Plaintiffs hereby repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "319" with the same force and effect as though set forth herein.

315.   That by reason of the foregoing, upon the imposition of the constructive trust over the recovery of any asset or profits made directly or indirectly and arising from

the conduct complained of herein Plaintiffs are entitled to the appointment of a Referee; together with permanent injunctive relief prohibiting the Defendant **Tonuzi, Elias** and/or **Doe 1-5 and Roe 1-5** from claiming ownership or use of assets held by them.

### Count XVI.
### Accounting
### *( Defendants Tonuzi, Elias, Spin and/or VTS Doe 1-5 and Roe 1-5)*

316.   Plaintiffs hereby repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "315" with the same force and effect as though set forth herein.

317. 302.   Since at least January 2000, the ***RICO Defendants*** **Tonuzi, Elias, Doe 1-5 and/or Roe 1-5** have conspired to conduct business through the use of unlawful conduc . The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

318.   The acts were in violation of 18 U.S.C. §2; 18 U.S.C. §371; 18 U.S.C. § 1341-1343; 18 U.S.C. §§ 1951, 1956, 1957; 18 U.S.C. §§ 1962 (a), (b) and (c) and 18 U.S.C. §§ 2314-2315; grand larceny in violation of Organized Crime Control Act, N.Y. Penal Law §§ 460.00-.80, 155.05(e) iv, viii and ix, New York State Penal Law §§ 155.35-155.42 as indictable felony offenses  punishable by more than one year of incarceration, conduct which constitutes common law fraud-misrepresentation, conspiracy, conversion, aiding and abetting, breach of contract, and unjust enrichment.

319.   By reason of these violations the ***RICO Defendants*** **Tonuzi, Elias, and/or Doe 1-5 and Roe 1-5** have received money as a result of their illegal activities and other wrongful

misconduct, all at the expense of, and undertaken at the expense of Plaintiffs, and as such said money is rightfully due to Plaintiffs.

320.   The amount of money due from *RICO Defendants* **Tonuzi, Elias, and/or Doe 1-5 and Roe 1-5** to Plaintiffs is presently unknown to Plaintiffs and cannot be ascertained without an accounting of the income and gross profits Defendants **Tonuzi, Elias, Doe 1-5 and Roe 1-5** have obtained through their wrongful and unlawful conduct.

321.   Plaintiffs are entitled, therefore, to a full accounting of all financial transaction involving all of the *RICO Defendants* **Tonuzi, Elias, and/or  Doe 1-5 and Roe 1-5** as to all transactions between themselves and

## Count XVII.
### Deprivation  of Property Rights and Liberty Deprivation of  Rights Under  The First and Fourteenth  Amendments     and   42 U.S.C. §1983

322.   Plaintiffs hereby repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "321", with the same force and effect as though set forth herein.

323.   The above described conduct and actions of the  individual defendants, occurred at a time where defendants were acting under color of law, where defendants deprived Plaintiff of her rights to property and liberty  due to Defendants **Tonuzi** and **Sheridan's** personal animus and bias in order to convert Plaintiff property in retaliation against Plaintiff's exercise of  protected right to  ownership and to eliminate illegal-wrongful conduct.

324.   The acts were done to interfere with, and chill, the exercise of ownership and were done intentionally, maliciously, with a deliberate indifference and/or with a reckless disregard for the natural and probable consequences of their acts, was done without lawful justification or reason, and was designed to and did cause serious emotional pain and suffering in violation of Plaintiff Franzone's constitutional rights as guaranteed under 42 U.S.C. §1983, and the First and Fourteenth Amendments to the United States Constitution.

325.   By reason of the foregoing, Plaintiff suffered injuries-damages and is entitled to an award in an amount to be determined by a jury sitting in judgment of her claims and in an amount no less than $3,000,000.

**Count XVIII.**
**Municipal Liability**
**<u>For Constitutional Violations</u>**
*Monell* Claim - 42 U.S.C. §1983

326.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "325" with the same force and effect as if fully set forth herein.

327.   The City of New York directly caused the constitutional violations suffered by Plaintiff, and is liable for the damages suffered by Plaintiff as a result of the conduct of the Captain James Grant as associated with non-Municipal defendants.

328.   The joint conduct of the Defendant Grant was a direct consequence of policies and practices of Defendant City of New York.

329.    At all times relevant to this complaint Defendant City of New York, acting through the NYPD, had in effect policies, practices, and customs that condoned and fostered the unconstitutional conduct of the individual defendants, and were a direct and proximate cause of the damages and injuries complained of herein.

330.    That on September 23, 2009 and again on April 23, 2010, Plaintiff became the victims of the Defendant City of New York'

331.    That at all times mentioned herein Plaintiff Franzone was injured in her business and property by the actions of New York City police officers in their capacities as **RICO Person.**

332.    That at all times mentioned herein, by reason of its policies, practices, customs, and usages in failing to have a protocol in place to ensure noninterference of the right of her ownership to property Plaintiff was injured in her business.

333.    Upon information and belief, Defendant City of New York implemented a policy, practice, custom and usage of preference to individual who were police officers and/or former police officers and their families.

334.    In connection with the Plaintiff's claims of  interference with her property interest the City under its policy-practice custom consciously disregarded whether Plaintiff was in the lawful possession of the CTS premises in favor of **Tonuzi** and **Sheridan** and whether the illegality and unconstitutionality of the non-Municipal defendants' claims was being maliciously pursued.

335.    These policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

336.    The existence these unconstitutional customs and policies, specifically as it relates to issues of  property ownership.

337.  The City of New York knew or should have known by the lack of training that a deliberate indifference to the rights of the Plaintiff would occur.

338.  By reason of the foregoing acts of the Defendants it was the policy and/or custom of the City of New York to inadequately train, supervise and discipline its police officers, including the **RICO Person Defendants of the *NYPD Enterprise***, thereby failing to adequately discourage further constitutional violations on the part of its employees.

339.  The City did not require appropriate in-service training of officers who were known to have engaged in the deliberate indifference to the property right and/or liberty rights including the rights of Franzone prior to arresting an individual.

340.  By reason of the foregoing described policies and customs, police officers of the City of New York, including the defendant employees  believed that their actions would not be properly monitored by supervisory personnel and that misconduct would not be investigated or sanctioned, but would be tolerated.

341.  The wrongful policies, practices, customs and/or usages complained of herein, demonstrated a deliberate indifference on the part of policymakers of the

City of New York to the constitutional rights of persons within the city, and were the direct and proximate cause of the violations of Plaintiffs' rights alleged herein.

342.   That by reason of the foregoing, Plaintiff has sustained damages in an amount to be determined by a jury.

## Count IXX.
## False Arrest/Imprisonment Under 42 U.S.C. § 1983/ State Law Claims

343.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "342" with the same force and effect as if fully set forth herein.

344.    As a result of defendant's aforesaid conduct, Plaintiff was subjected to an illegal, improper and false arrest/imprisonment by defendants **Tejera and Guerin,** and was taken into custody and caused to be falsely imprisoned, detained, confined, incarcerated and prosecuted by the defendants in criminal proceedings, without any probable cause, privilege or consent.

345.    By reason of the foregoing, plaintiff's liberty was restricted for an extended period of time, she was put in fear for her safety, was physically and emotionally injured, she was repeatedly strip-searched and humiliated, and she suffered substantial economic losses and permanent damage to his reputation.

346.   That by reason of the foregoing, Plaintiff has sustained damages in an amount to be determined by a jury.

**WHEREFORE**, with respect to the above claims and causes of action, Plaintiff respectfully prays that this Court:

a.      Issue judgment against the Defendants to make whole the Plaintiff Franzone by providing appropriate damages for the violation of her civil and constitutional rights and for in an amount to be shown at trial and other affirmative relief  in a sum no less than $5,000,000.00;

b.      Grant judgment on her remaining claims and cause of action including award compensatory in a sum no less than $2,900,000.00 punitive, and liquidated damages in the amount of $10,000,000.00 or such greater amount as may be proved at trial or such other sum as the law may provide; and

c.      Grant Plaintiffs' their attorney's fees, costs and other disbursements; and

d.      Grant such addition relief as the Court deems just and proper.


Dated: August 15, 2014
        Goshen, New York

_____
      DOUGLAS R. DOLLINGER, ESQ., P.C.
          & Associates
      Attorneys for Plaintiff
      50 Main Street
      White, New York 10606
      Tele.  845.915.6800
      Fax.   845.915.6801


    The City of New York
    Municipal Building
    One Centre Street
    New York, New York 10007

The   New York City Police Department
One Police Plaza
New York, New York 10007
333 65th Street Brooklyn
New York 11220

Charbel Elias aka Charlie Elias
Home 41 Gelsten Avenue
Brooklyn, New York 11209
**Charles Elias Salon 7802** Third Ave
Brooklyn, New York 11209 718 238 3500

Violette Tonuzi
98 15th Street Brooklyn New York 11215
Work Cavale Tonuzi Spa
8209/8211 Third Avenue
Brooklyn, New York 11209

Lilian Narbone
6 Horizon Road # 1503
Fort Lee New Jersey 07024

Farihje Tonuzi SHERIDAN aka Farije Tonuzi
Home Staten Island NY
Work Cavale Tonuzi Spa
8209/8211 Third Avenue
Brooklyn, New York 11209

Hanna Tonuzi Alverez aka Anna Tonuzi Aka Hanna Alverez aka Anna
Alverez
Staten Island New York
Cavale Tonuzi Spa
8209/8211 Third Avenue
Brooklyn New York 11209
72nd Precinct 830 4th Avenue
Brooklyn New York 11232

Captain Donald Grant
68th Precinct
333 65th Street
Brooklyn, New York 11220

Juan Tejera Detective
Midtown South 357 West 35th Street
New York, New York 10001

Ann M Guerin Detective
357 West 35th Street
New York, New York 10001

## **ATTORNEY VERIFICATION**

State of New York          )
                           ) SS.:
County of Westchester      )

DOUGLAS R. DOLLINGER, an attorney duly admitted to practice before all of the Courts of the State of New York, hereby affirms pursuant to CPLR §2106 making this Verification and says, that deponent that deponent has read the foregoing allegations which are based upon conversation with the Plaintiff and on her personal knowledge, when pertaining to herself and, all other claims being based upon information and belief, the basis of which is an investigation and research of relevant documents or reports involving official investigations obtained as well as publically available materials related to all other facts alleged in the Complaint.

That the reason the undersigned makes this verification is that the Plaintiff resides in a County other than Westchester County where your deponent maintains his practice-office.

Affirmed: Goshen, New York
          August 15, 2014

_____
DOUGLAS R. DOLLINGER, ESQ.

## <u>CERTIFICATE OF SERVICE</u>

I, Douglas R. Dollinger, the attorney of record for Plaintiff **GEORGETTE FRANZONE, GEORGE F. LLC, CAVALE TONUZI INC., & G. LIFESTYLE SPA INC.,** hereby certify that on the date shown below, one copy of the foregoing **SECOND AMENDED VERIFIED COMPLAINT** was caused to be served upon Attorneys for Defendants ECF / Electronic Case Filing system and all Pro Se Defendants via U.S. Mail.

On this 15th day of August 2014.

                                                 _____

                                                 Douglas R. Dollinger, Esq.