UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

GEORGETTE FRANZONE, GEORGE F. LLC,
CAVALE TONUZI INC., & G. LIFESTYLE SPA
INC.,

                    **Plaintiffs,**

    - v. -

THE CITY OF NEW YORK, THE NEW YORK
CITY POLICE DEPARTMENT, NEW YORK
CITY POICE OFFICER JUAN TEJERA and
JUAN TEJERA individually, NEW YORK
CITY POLICE CAPTAIN JAMES GRANT, and
JAMES GRANT individually, NEW YORK CITY
POLICE OFFICER ANN GUERIN, and ANN
GUERIN individually, NEW YORK CITY POLICE
OFFICER HANNA "ANNA" TONUZI ALVAREZ
and HANNA "ANNA" TONUZI ALVAREZ
individually, NEW YORK CITY POLICE OFFICER
FRANKIE"FRANK" ALVAREZ and FRANKIE
"FRANK" ALVAREZ individually, VIOLETTE
TONUZI, FARIJE TONUZI-SHERIDAN, JOSEPH
TRISCHITTA, MARCO VENEZIA, WILLIAM
MASSO, LILIANA "CALOGERA" NARBONE,
MARY CARBONE, HEDDA SCHACHTER,
FRANK CORIGLIANO, PROGRESSIVE CREDIT
UNION, VIOLETTE TONUZI SALON and DAY
SPA, C. ELIAS ENTERPRISE INC., d/b/a
CHARLES ELIAS SALON AND SPIN SALON,
JOHN DOE and/or JANE DOE,

                    **Defendants.**

------------------------------------------------------------------x

OPINION AND ORDER

13-cv-5282 (NG)

**GERSHON, United States District Judge:**

    This is the latest in a series of lawsuits arising from the demise of a Brooklyn salon and

spa. In this action, the salon and spa's former manager, Georgette Franzone, and three affiliated

entities allege that defendants—an assortment of individual, corporate and municipal actors—

1

perpetrated a racketeering scheme and other offenses to deprive plaintiffs of their interests in the business. Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, as well as under 42 U.S.C. § 1983 and New York state law. Certain defendants have moved to dismiss, others have answered. For reasons that follow, all federal and several state law claims asserted in plaintiffs' Second Amended Complaint ("SAC") are dismissed, and I decline to exercise supplemental jurisdiction over the state law claims that remain.[1]

## FACTUAL ALLEGATIONS[2]

Plaintiff Georgette Franzone describes herself as "a successful business venture capitalist engaged in advertising as well as private project funding." SAC ¶ 70. In early 1999, Franzone agreed to assist defendant Violette Tonuzi, and non-defendants Charles Elias and Robert Cavalcante (who plaintiffs refer to as "Robert Cavale"), in launching a new salon and spa. To do so, Franzone extended a bridge loan to her new business partners on the condition that they form a company in which Franzone would be a shareholder. They agreed, forming plaintiff Cavale Tonuzi Inc., a corporate entity that would do business as Cavale Tonuzi Spa ("CTS"). Pursuant

---

[1] On March 12, 2015, after defendants' motions were fully briefed, plaintiffs requested permission to file a motion to stay proceedings in this court pending resolution in New York state court of non-defendant Elias's ownership interest in the salon and spa as of February 5, 2013. Plaintiffs' papers set forth in detail the contents of their proposed motion, and the oppositions submitted by defendants similarly address its merits. Accordingly, plaintiffs' submission will be treated as a motion to stay, which I deny. Plaintiffs, who elected to file claims in this court during the pendency of state court proceedings, have identified no basis to enter a stay.

[2] The facts set forth in this opinion are taken from plaintiffs' SAC and documents incorporated therein. *See Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011) (court may consider on a motion to dismiss "documents incorporated by reference in the complaint" and documents on which the plaintiff "relied on in bringing suit" without converting the motion into one for summary judgment (internal quotation marks omitted)). The facts asserted in the SAC are, for purposes of this opinion, assumed true.

to a Shareholders Agreement, as modified, Cavale Tonuzi Inc.'s shares were divided between Franzone (28.33%), Tonuzi (28.33%), Cavalcante (28.33%) and Elias (15%). Franzone also was granted an exclusive right to redeem her shares based on a valuation of the business or at a specified sum of $7,500 per share plus interest.[3]

Under the Shareholders Agreement, Tonuzi and Cavalcante assigned their existing clientele to the new company while agreeing, along with Elias, not to perform competing salon and spa services within CTS's geographic vicinity. Franzone, in turn, agreed to manage CTS in accordance with a separately executed management agreement. In that capacity, Franzone immediately set out to obtain additional funding to construct new facilities.

In July 2000, Franzone negotiated a loan agreement with defendant Progressive Credit Union ("Progressive"), pursuant to which Tonuzi and Cavalcante borrowed $625,000 (the "Loan Agreement" or "Progressive Loan"). To secure the loan, Cavale Tonuzi Inc. and Franzone, among others, guaranteed the borrowers' obligations. In addition, Franzone and Tonuzi granted Progressive mortgage liens on properties they separately owned. After obtaining the Progressive Loan, Franzone oversaw the buildout of the new salon and spa and, once the business opened, she managed day-to-day operations.

Sometime during 2002 or 2003, Tonuzi and Elias began taking steps to damage Franzone's interests in CTS. Improprieties came to Franzone's attention in 2003 when CTS floor manager Dawn Cavalcante (wife of shareholder Robert Cavalcante) told Franzone that Tonuzi and Elias were not reporting tips and were skimming cash from the register. When

---

[3] Though immaterial to the present motions, plaintiffs mischaracterize the Shareholders Agreement in alleging that Franzone was issued "100% of the preferred shares." SAC ¶ 78. The Shareholders Agreement does not provide for a separate issuance of preferred shares. Rather, Franzone received common shares that were "preferred" only insofar as they were redeemable, whereas the common shares issued to Tonuzi, Cavalcante and Elias were not.

confronted, Tonuzi and Elias demanded that Franzone terminate Dawn Cavalcante. After Franzone refused, Tonuzi and Elias antagonized the Cavalcantes until they left the business.[4]

Having driven the Cavalcantes away, Tonuzi and Elias continued to skim cash from the register. Whenever Franzone inquired as to missing funds, Tonuzi and Elias told Franzone that the money had been used to pay hairstylists working as independent contractors. In 2003, the IRS conducted a field audit at CTS and found that the business was not properly reporting gratuity income. Tonuzi and Elias denied any wrongdoing.

Later in 2003 it became clear to Franzone that, as a result of Cavalcante's departure, CTS would require a cash infusion to cover operating expenses. Franzone told Tonuzi and Elias that, if they could not contribute, she would be required to sell the business. In response, Tonuzi and Elias made false promises to reform their conduct, which convinced Franzone to sell her home to raise the necessary funds. To complete the sale, Franzone paid Progressive $150,000 to release its mortgage lien against the property. Franzone used the sale proceeds to pay down $75,000 on the Progressive Loan, and she deposited an additional $75,000 in CTS's operating accounts. In exchange, Franzone received a $162,000 promissory note from Tonuzi and Elias. In 2005, plaintiff George F. LLC, an entity affiliated with Franzone, injected additional operating cash into the business in exchange for a $220,000 promissory note from Tonuzi and Elias.

These cash infusions did nothing to curtail Tonuzi's and Elias's misconduct. Between 2003 and 2007, Tonuzi and Elias continued to skim cash while developing more subtle techniques, including issuing gift certificates in exchange for cash or personal checks that they pocketed, and charging gratuities as service fees to avoid reporting income. Elias also charged

---

[4]     The fate of Cavalcante's shares is unclear. The SAC indicates both that Franzone "purchased Robert Cavale's shareholder interest," SAC ¶ 112, and that the shares are "being held in treasury." *Id.* ¶ 79.

4

$10,000 on his personal credit card and took a corresponding sum from CTS's accounts. Tonuzi, for her part, began servicing CTS clients from home and, when she did report to work, she undercharged clients and encouraged them to make supplemental cash payments directly to her.

At some point in 2007, Franzone told Tonuzi and Elias that she had "had enough" and wanted out of the business. *See* SAC ¶ 158. At this point, plaintiffs allege that Franzone's shares were worth at least $364,427.71, and that she and plaintiff George F. LLC had amassed promissory notes from defendants in excess of $500,000.[5] Tonuzi and Elias refused to pay these sums. Protracted litigation ensued.

Elias filed the first action, a petition in the New York Supreme Court, Kings County, to dissolve Cavale Tonuzi Inc. on the ground that Franzone was mismanaging the business. Franzone and George F. LLC responded by initiating separate lawsuits in the same court to recover on their promissory notes. In December 2008, the parties entered a global, but conditional, settlement agreement (the "Settlement Agreement"). The Settlement Agreement provided that Franzone would purchase Tonuzi's and Elias's shares in Cavale Tonuzi Inc. on the condition that, within six months, Franzone could (1) obtain a lease extension for CTS and (2) substitute or otherwise remove the mortgage against Tonuzi's property that secured the Progressive Loan.

Plaintiffs allege that soon after the Settlement Agreement was executed, Elias began competing directly with CTS by operating his own salon, an entity identified in the SAC as defendant C. Elias Enterprise Inc., d/b/a Charles Elias Salon and Spin Salon ("Spin"). Tonuzi,

---

[5]     The promissory notes described in the SAC total only $382,000. It is unclear whether plaintiffs are alleging that the additional amount Franzone claimed was owed as interest on the initial notes or under other notes unspecified in the SAC.

for her part, continued to serve clients from her home and, at some point, began to operate defendant Violette Tonuzi Salon and Day Spa ("VTS").

As Tonuzi and Elias devoted themselves to their competing operations, they allegedly enlisted the assistance of others to further eliminate plaintiffs' interests in what remained of CTS. They began by sabotaging plaintiffs' efforts to satisfy the preconditions set forth in the Settlement Agreement. In particular, early in 2009 Franzone obtained, as required by the Settlement Agreement, a lease extension from CTS's landlords, defendants Mary Carbone, Hedda Schachter, and Frank Corigliano ("Landlord Defendants"). To secure the lease, Franzone placed $60,000 in a trust account controlled by the Landlord Defendants. Tonuzi and Elias, fearful that Franzone would satisfy the preconditions specified in the Settlement Agreement to acquire CTS outright, told the Landlord Defendants "that Franzone was a thief and was going to be arrested by the Brooklyn District Attorney's Office for embezzling from CTS." SAC ¶ 180. On the basis of these allegations, the Landlord Defendants allegedly withheld the lease and refused to return Franzone's $60,000.

Tonuzi and Elias next solicited the assistance of defendant Farije Tonuzi-Sheridan, a former officer of the New York City Police Department ("NYPD") and sibling of defendant Tonuzi. At Tonuzi's request, Tonuzi-Sheridan contacted members of the NYPD who she "knew where engaged in various criminal activities" and convinced them to bar Franzone from entering CTS. *Id.* ¶ 184. On September 30, 2009 unspecified members of what plaintiffs call the "NYPD Enterprise"[6] changed CTS's locks and, over the following two weeks, provided "[a]round-the-clock security" preventing Franzone from entering the premises. *See* SAC ¶ 186.

---

[6]    The SAC describes the "NYPD Enterprise" to include current and former NYPD officer defendants James Grant, Juan Tejera, Ann Guerin, Hanna Tonuzi-Alvarez, Frank Alvarez, Joseph Trischitta, Marco Venezia, and William Masso. *See* SAC ¶ 29.

Shortly after Franzone had been expelled from CTS, Franzone filed another action in New York Supreme Court, Kings County, this time seeking a preliminary injunction enjoining Tonuzi and Elias from, *inter alia*, (a) taking any part in the operation of CTS, and (b) preventing Franzone from entering the business. According to plaintiffs, Tonuzi and Elias opposed Franzone's motion with false affidavits, on the basis of which Justice Carolyn E. Demarest concluded that Franzone had seized control of CTS and amassed "numerous past due and unpaid rent, bills, and taxes, and unauthorized loans," indicating "unlawful diversion of corporate funds." *See* Declaration of Theresa D'Andrea ("D'Andrea Decl."), Ex. B at 20–21 (Dkt. no. 98-2). The court concluded that Franzone was unlikely to prevail on the merits of her claims because "Elias and Tonuzi, as the owners of two-thirds of the shares of Cavale [Tonuzi Inc.], maintain a controlling interest in the business and reasserted their collective ability to terminate Franzone's management of Cavale on September 22, 2009, following a duly noticed meeting of shareholders and a corporate resolution." *Id.* at 20. Denying Franzone a preliminary injunction, the court reasoned, would "maintain the status quo by preventing any diversion, loss, waste, or looting of corporate assets by Franzone." *Id.* at 21.

During the pendency of proceedings before Justice Demarest, Tonuzi and Elias sought the assistance of defendant Liliana "Calogera" Narbone, who plaintiffs describe as "a known and convicted counterfeiter." SAC ¶ 192. Plaintiffs claim that, at the request of Tonuzi and Elias, Narbone initiated a civil action against Franzone seeking payment on a forged $100,000 promissory note. Narbone withdrew her claims against Franzone in 2012 but not before she filed a report with the NYPD containing allegedly false statements (unspecified in the SAC) concerning Franzone. On the basis of Narbone's report, Tonuzi-Sheridan convinced defendant Tejera to arrest Franzone. Tejera made the arrest on April 23, 2010 with the assistance of his

partner, defendant Guerin. Franzone spent over 30 hours in custody and charges were never filed.

Plaintiffs allege that, having ousted Franzone from CTS and caused her arrest, Tonuzi and Elias proceeded to default on the 2000 Progressive Loan. In January 2011, Progressive commenced an action to recover the balance owed on the loan and was awarded a judgment of $337,619 against Tonuzi, Cavalcante, Franzone, Elias, and Cavale Tonuzi Inc. SAC ¶ 217. But that is not all. Plaintiffs claim that Progressive never recorded the mortgage it had obtained against Tonuzi's property and, aware of this oversight, Tonuzi disencumbered the property by transferring it to her sister and brother-in-law, defendants Hanna Tonuzi-Alvarez and Frank Alvarez, before Progressive obtained its judgment. The SAC intimates that Progressive is now unable to foreclose against the Tonuzi property to satisfy the judgment, prejudicing Franzone and the other judgment obligors.

## PROCEDURAL HISTORY

The aforementioned state court actions remain pending before Justice Demarest in New York Supreme Court, Kings County. On July 20, 2011, Franzone filed an additional complaint in state court alleging that Tonuzi and Elias embezzled from CTS and conspired with various members of the NYPD and Narbone to have her expelled from CTS and arrested. This action, too, is currently pending before Justice Demarest.

Presumably unsatisfied with Franzone's progress in state court, plaintiffs filed a complaint in this court on September 23, 2013, asserting many of the claims, against many of the defendants, identified in Franzone's July 20, 2011 state court complaint. The federal complaint, however, centered on a set of RICO claims Franzone had not previously asserted. It also added two new plaintiffs (G. Lifestyle Spa Inc. and George F. LLC), additional NYPD officer

defendants, and separate breach of contract claims against Progressive and the Landlord Defendants.

On May 20, 2014 plaintiffs moved voluntarily to dismiss all claims in this court against Elias (but not Spin, Elias's salon) after Elias's debts were discharged in bankruptcy and plaintiffs had unsuccessfully challenged the discharge order. *See In re Elias*, 2014 WL 1248042 (E.D.N.Y. Mar. 25, 2014). The court granted the motion. Several of the remaining defendants answered the complaint. Others filed motions to dismiss or submitted letters requesting a pre-motion conference to address anticipated motions.

The parties appeared for a pre-motion conference on June 20, 2014. At that time, I observed that the complaint suffered "obvious deficiencies" and, with the consent of all parties, allowed plaintiffs an opportunity to replead. *See* Dkt. no. 66 at 6. Plaintiffs were advised that— in addition to being "prolix," "repetitive," and at times "unintelligible"—the complaint's core RICO allegations did not set forth the "basis for liability of each defendant." *Id.* at 7, 8. Plaintiffs were instructed "to make a list" of the predicate acts each defendant allegedly committed, identifying the statutes violated, and pleading with particularity any predicate acts sounding in fraud. *Id.* at 9. To accomplish this reformulation, plaintiffs were cautioned not to take the already "lengthy complaint and add more things to it" but rather to streamline the allegations so that "each defendant knows what he or she is accused of." *Id.* at 7.

Plaintiffs filed an amended complaint on July 18, 2014. After several defendants advised plaintiffs that the amendments did not cure deficiencies addressed at the June 20, 2014 conference, plaintiffs indicated that they would seek leave to further amend if defendants moved to dismiss. To avoid unnecessary motion practice, defendants consented to plaintiffs filing a second amended complaint, but on the condition that plaintiffs would not further amend. *See*

Dkt. nos. 67 & 68. The Honorable James Orenstein, magistrate judge, granted leave to amend on that condition.

The SAC was filed August 15, 2014. Asserting 19 counts against 20 defendants in various combinations, the SAC is not a page shorter than plaintiffs' initial complaint. The SAC's federal claims consist of four RICO counts against certain "RICO Defendants"—namely, Tonuzi, VTS, Hanna Tonuzi-Alvarez, Frank Alvarez, Narbone, Tonuzi-Sheridan, Tejera, Guerin, Grant, Trischitta, and Masso, *see* SAC ¶¶ 35–46—and three claims under 42 U.S.C. § 1983, alleging false arrest, constitutional deprivations of liberty and property interests, and municipal liability. Plaintiffs' remaining claims arise under state law. Specifically, the SAC asserts fraud, fiduciary duty, and breach of contract claims against Tonuzi; unjust enrichment, unfair competition, conversion, constructive trust, injunctive relief, and accounting claims against Tonuzi, VTS and Spin; separate breach of contract claims against Progressive and the Landlord Defendants; a false imprisonment claim against Tejera and Guerin; and an intentional infliction of emotional distress claim against all RICO Defendants.

Defendants have responded to the SAC as follows: **Spin** moves to dismiss plaintiffs' RICO claims and requests that the court decline to exercise jurisdiction over the state law claims that remain against Spin; the **City of New York, NYPD, and officers Grant, Masso, Tejera, Trischita, and Venezia (together, "NYC Defendants")**[7] move to dismiss all claims asserted against them; **Tonuzi-Sheridan and Narbone**, each appearing *pro se*, move to dismiss all claims asserted against them; **Progressive** moves to dismiss or, in the alternative, for summary judgment, on plaintiffs' breach of contract claim against Progressive (the only claim plaintiffs assert against Progressive); **Tonuzi, VTS, Hanna Tonuzi-Alvarez, and Frank Alvarez**

---

[7]     Former NYPD officer Guerin was not served. However, the grounds for dismissal set forth in the NYC Defendants' motion apply with equal force to Guerin.

(together, **"Tonuzi Defendants"**) jointly answered the SAC and filed counterclaims for Rule 11 sanctions and attorney's fees, as well as cross-claims against all defendants for indemnification; and the **Landlord Defendants** answered the SAC and filed a counterclaim against Franzone and Cavale Tonuzi Inc. for payment of unpaid rent, as well as cross-claims against all defendants for indemnification.

## DISCUSSION

A complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This requirement ensures that the defendant is given "fair notice of the claim asserted so as to enable him to answer and prepare for trial." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).

Although a pleading need only be "short and plain," a complaint is subject to dismissal under Fed. R. Civ. P. 12(b)(6) if it contains nothing more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On a motion to dismiss the court must assume the truth of "well-pleaded factual allegations" and "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. To meet this standard, a complaint must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

In addition to meeting the plausibility standard, RICO allegations sounding in fraud must be pleaded with particularity pursuant to Fed. R. Civ. P. 9(b). *See McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992). To satisfy Rule 9(b) a plaintiff must, at a minimum, "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."

*Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013) (internal quotation marks omitted).

## I.     The SAC Does Not Comply With Rule 8(a)(2)

The 85-page and 346-paragraph SAC is anything but the "short and plain statement" Fed. R. Civ. P. 8(a)(2) contemplates.  In this respect the SAC is no improvement on plaintiffs' prior complaints.  Rather than refocus their allegations in accordance with instructions provided at the June 20, 2014 conference, plaintiffs have simply moved paragraphs around and introduced more of the repetition, prolixity and garble that plagued their previous efforts.

Particularly troubling is plaintiffs' failure to separately delineate the alleged predicate acts of each RICO Defendant, despite express instructions to do so.  Instead, the SAC continues to lump defendants together in a sprawling narrative that gives individual defendants inadequate notice of the allegations, if any, to which they must respond.  This approach "places an unjustified burden" on defendants who "are forced to select the relevant material from a mass of verbiage." *Salahuddin*, 861 F.2d at 42 (internal quotation marks omitted).

It also is not always clear which of the SAC's counts are directed against which defendant.  For example, plaintiffs' §1983 claim asserting impingement on property and liberty interests (Count XVII) is not limited to any particular defendant or defendants.  *See* SAC ¶ 323 ("The above described conduct and actions of the individual defendants . . . deprived Plaintiff of her rights to property and liberty.").  Similarly, plaintiffs' RICO § 1962(a) claim (Count I) is ostensibly directed against "RICO Defendants Tonuzi and Elias."  Although plaintiffs now agree that they dismissed all claims against Elias, after his debts were discharged in bankruptcy, their references to him as a defendant in the SAC have sown confusion.  In addition, plaintiffs' description of their § 1962(a) claim goes on to address all "RICO Defendants," a term used in the

SAC to describe numerous defendants other than Tonuzi and (non-defendant) Elias. *See* SAC ¶¶ 35–46. These other RICO Defendants can only speculate as to whether they are obliged to respond to plaintiffs' § 1962(a) claim.

Plaintiffs' claims asserting violations of RICO §§ 1962(b) and 1962(c) (Counts II & III), are leveled against, *inter alia*, "Tonuzi-Elias" and "Tonuzi-Sheridan." These hyphenated entities are nowhere defined in the SAC. Fusing defendants (and former defendants) into mysterious compounds fosters confusion that Rule 8 is designed to prevent. *See Targum v. Citrin Cooperman & Co.*, LLP, 2013 WL 6087400, at *6 (S.D.N.Y. Nov. 19, 2013) (complaint did not comply with Rule 8 when it "confusingly treat[ed] Weber and Citrin as a unit—referring at various times to 'Citrin and Weber,' 'Citrin and/or Weber,' and 'Citrin/Weber'"). More bewildering still, there are multiple "Tonuzi" defendants in this case, and one of them is named Farije Tonuzi-Sheridan. Whether plaintiffs are using "Tonuzi-Sheridan" to refer to Farije Tonuzi-Sheridan alone, or in combination with some other Tonuzi defendant, is unclear.

In keeping with its collective treatment of "defendants," the SAC likewise fails to adequately differentiate plaintiffs. Remarkably in this regard, the SAC never explains the role, if any, plaintiff G. Lifestyle Spa Inc. played in relevant events. The SAC is only slightly more revealing as to plaintiff George F. LLC, indicating that George F. LLC infused cash into CTS in exchange for a promissory note on which defendants defaulted. But of the SAC's 19 counts, not one seeks payment on George F. LLC's note, and breach of contract is not a predicate act that might support plaintiffs' RICO claims. *See* 18 U.S.C. § 1961(1). George F. LLC's connection to the claims being asserted is thus equally uncertain.

Plaintiffs have been given two opportunities to replead, the last on the condition that they would not seek further leave to amend. Under the circumstances, dismissal solely for

noncompliance with Rule 8(a)(2) would be warranted. *See Strunk v. United States House of Reps.*, 68 Fed. App'x. 233, 235 (2d Cir. June 23, 2003) (district court "well within its discretion" dismissing with prejudice under Rule 8(a)(2) where plaintiff had been given prior opportunity to replead with express instructions on how defects in prior pleading could be cured). My disposition of defendants' motions, however, does not rest solely on Rule 8(a)(2). Benefitting from even the most charitable construction, the SAC is subject to dismissal on grounds detailed below.

## II. The SAC's RICO Claims Are Defective

RICO creates a private right of action against "'any person' who uses or invests income derived 'from a pattern of racketeering activity' to acquire an interest in or to operate an enterprise engaged in interstate commerce, § 1962(a); who acquires or maintains an interest in or control of such an enterprise 'through a pattern of racketeering activity,' § 1962(b); who, being employed by or associated with such an enterprise, conducts or participates in the conduct of its affairs 'through a pattern of racketeering activity,' § 1962(c); or, finally, who conspires to violate the first three subsections of § 1962, § 1962(d)." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232–33 (1989) (quoting 18 U.S.C. § 1962).

Plaintiffs here assert substantive RICO claims under each of § 1962(a)-(c), and a RICO conspiracy claim under § 1962(d).

### A. The SAC Does Not Allege a Substantive RICO Violation

To state a substantive RICO claim a plaintiff must allege, among other elements, a "pattern of racketeering activity." *See H.J. Inc.*, 492 U.S. at 232–33; *see also Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154 (1987) ("[T]he heart of any RICO complaint is the allegation of a pattern of racketeering."). RICO defines "racketeering activity"

as the commission of certain exhaustively enumerated predicate acts. *See* 18 U.S.C. § 1961(1); *Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985). To engage in a "pattern of racketeering activity" a defendant must commit at least two predicate acts. *See* 18 U.S.C. § 1961(5). In addition, the predicate acts must be "related" to each other and "amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239. That is to say, in RICO parlance, that predicate acts form a pattern if they exhibit "relatedness" and "continuity." *United States v. Cain*, 671 F.3d 271, 277 (2d Cir. 2012).

Importantly, RICO allegations must be evaluated "with respect to each defendant individually." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004). A plaintiff must show that each "defendant personally committed or aided and abetted the commission of two predicate acts," *McLaughlin*, 962 F.2d at 192, and that those particular acts form a "pattern" of racketeering activity. *See Satinwood*, 385 F.3d at 180.

Glaringly absent from the SAC here is any attempt to specify, for each RICO defendant, the commission of two predicate acts. The closest the SAC gets to individually enumerating predicate acts is in a section titled "Predicate Acts of the *NYPD Enterprise*." SAC ¶¶ 219–38. That section, however, addresses only members of the so-called NYPD Enterprise; it does not attempt to specify the predicate acts of the remaining RICO Defendants. And as to each member of the NYPD Enterprise, plaintiffs simply repeat, verbatim, the same "extortion" claim— specifically, that these defendants, "using the police powers bestowed upon them by [the NYPD], through a pattern of extortion in violation of New York Penal Law 155.05(2)(e)(viii), whereby the Plaintiff was threatened into surrendering and being repeatedly banned from her property-business." *Id.*

Plaintiffs' extortion theory is substantively unsound.[8] More fundamentally, extortion is a *single* predicate act. *See Andrea Doreen Ltd. v. Bldg. Material Local Union*, 282, 299 F. Supp. 2d 129, 153 (E.D.N.Y. 2004). It makes no difference if, as plaintiffs seem to contend, the extortion alleged was accomplished over several weeks or in multiple steps. *See id.* (repeated attempts to extort money from plaintiff constituted "one act" for RICO purposes); *see also Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) ("[C]ourts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO.").

The SAC's extended narrative likewise fails to specify two predicate acts as to any defendant. Plaintiffs' central allegation is that Tonuzi and (non-defendant) Elias embezzled from CTS and converted CTS assets. Embezzlement from an individual or business, however, is not a predicate act. *See Toms v. Pizzo*, 1998 WL 964199, at *2 (2d Cir. Feb. 2, 1998). Nor is conversion. *See Terrell v. Eisner*, 104 Fed. App'x 210, 212 (2d Cir. 2004).

Plaintiffs also assert that Tonuzi filed false affidavits in state court and competed with CTS in violation of the Shareholders Agreement and Settlement Agreement; that Narbone filed a lawsuit to secure payment on a forged promissory note; that Tejera and Guerin falsely arrested Franzone; and that the Tonuzi Defendants improperly disencumbered Tonuzi's family property.

---

[8] The New York extortion statute plaintiffs invoke proscribes the "wrongful taking, obtaining or withholding of another's property" through various extortive means. *See* N.Y. Penal Law § 155.05(2). Only the "owner" of property can be a victim of extortion, and the statute defines the "owner" as "'any person who has a right to possession . . . superior to that of the taker.'" *United States v. Ivezaj*, 568 F.3d 88, 94 (2d Cir. 2009) (quoting N.Y. Penal Law § 155.00(5)). Here, plaintiffs have not plausibly alleged that they enjoyed superior rights to possess CTS at the time of Franzone's ouster. On the contrary Justice Demarest concluded that Tonuzi and Elias maintained a controlling shareholder interest in the company and, at a duly noticed meeting of the company's shareholders held the day before plaintiff was denied entry, Tonuzi and Elias exercised their lawful authority to "terminate" Franzone and seize "physical possession and control of the business." D'Andrea Decl. Ex. B at 12, 20.

None of this alleged misconduct, however, amounts to a RICO predicate. *See* 18 U.S.C. §
1961(1) (listing RICO predicate offenses); *In re Trilegiant Corp., Inc.*, 11 F. Supp. 3d 82, 103–
04 (D. Conn. 2014) (breach of contract not a RICO predicate); *Weaver v. James*, 2011 WL
4472062, at *4 (S.D.N.Y. Sept. 27, 2011) (filing fraudulent documents in litigation not a RICO
predicate); *DeFazio v. Wallis*, 500 F. Supp. 2d 197, 206 (E.D.N.Y. 2007) (forgery not a RICO
predicate); *Boulware v. Dep't. of Ins.*, 2009 WL 3830640, at *9 (C.D. Cal. Nov. 16, 2009) (false
arrest not a RICO predicate).

Plaintiffs fare no better with the general assertion that the RICO Defendants perpetuated
their scheme "telephonically." SAC ¶ 65. Wire fraud can be a predicate act, but it must be
alleged with particularity under Fed. R. Civ. P. 9(b). *See Satinwood, Inc.*, 385 F.3d at 178. Rule
9(b) is not satisfied with allusions to defendants' collective use of the wires. *See Nakahata*, 723
F. 3d at 197 (Rule 9(b) requires a plaintiff to specify the statements, the speaker, where the
statements were made and why they were fraudulent); *Mills v. Polar Molecular Corp.*, 12 F.3d
1170, 1175 (2d Cir. 1993) (complaint lacks requisite particularity if it "vaguely attributes the
alleged fraudulent statements to 'defendants'").

To the extent the SAC addresses discrete wire communications, it describes only two of
those communications as "predicate acts"—a November 26, 2006 "electronic transmission" and
"follow-up telephone" call that Elias made to Franzone when Franzone was in Florida. *See* SAC
¶ 155. Elias, however, is no longer a defendant in this case, and the message he allegedly
conveyed—that Franzone should "stop reporting income to the taxing authorities"—could not
have furthered any fraud on Franzone. *See id.; see also Crawford v. Franklin Credit Mgmt.
Corp.*, 758 F.3d 473, 488 (2d Cir. 2014) (wire communications that disclosed the existence of a

mortgage alleged to have been fraudulently procured could not "be viewed as furthering the alleged fraud").

The SAC also lists criminal offenses other than wire fraud—ranging from money laundering to interstate transportation of stolen property—that "defendants" purportedly committed. *See* SAC ¶¶ 15, 266. The SAC, however, nowhere explains which defendant committed which of the offenses, much less how. In addition to being utterly conclusory, plaintiffs' laundry list approach relies impermissibly on the type of "group pleading" that does not suffice for RICO purposes. *See In re Platinum and Palladicum Comm. Litig.*, 828 F. Supp. 2d 588, 602 (S.D.N.Y. 2011); *Gross v. Waywell*, 628 F. Supp. 2d 475, 495 (S.D.N.Y. 2009).

Effectively conceding the SAC's failure to enumerate two predicate acts as to any defendant, plaintiffs state that they "cannot without conducting discovery spell out in greater detail for now how each RICO Person Defendant individually participated in the wrongs alleged." Pls' Opp. NYC MTD, Dkt. no. 100 at 12. That specificity, however, is precisely what the law requires and what plaintiffs were instructed to provide.

Even if plaintiffs had specified two predicate acts as to any defendant, predicate acts must exhibit "continuity" to constitute a pattern of racketeering. *See GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 465 (2d Cir. 1995). To establish continuity, a RICO plaintiff "must allege either an 'open-ended' pattern of racketeering activity (*i.e.*, past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (*i.e.*, past criminal conduct 'extending over a substantial period of time')." *Id.* at 466.

Plaintiffs contend that the SAC pleads an "open-ended" pattern of racketeering activity. It does not. The RICO scheme plaintiffs allege was admittedly "singular in purpose." SAC ¶ 62. Its sole objective was "gaining control of the assets of CTS." *Id.* ¶ 54. And if plaintiffs are to be

believed, that objective was accomplished. Such a discrete and "inherently terminable" scheme constitutes anything but an "open-ended" pattern of racketeering. *See GICC Capital Corp.*, 67 F.3d at 466 ("It defies logic to suggest that a threat of continued looting activity exists when, as plaintiff admits, there is nothing left to loot."); *Spool v. World Child Int'l Adoption Ag.*, 520 F.3d 178, 186 (2d Cir. 2008) (no "open-ended" pattern where RICO scheme was "inherently terminable" (internal quotation marks omitted)).

Discrete schemes typically do not establish a "closed-ended" pattern either. *See FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F. Supp. 2d 362, 372 (E.D.N.Y. 2002) ("Courts in the Second Circuit have generally held that where the conduct at issue involves a limited number of perpetrators and victims and a limited goal, the conduct is lacking in closed-ended continuity.").[9] Moreover, the Second Circuit "has never found a closed-ended pattern where the predicate acts spanned fewer than two years." *Satinwood*, 385 F.3d at 181. Here, the only predicate act specifically alleged against any defendant in the SAC is extortion by the so-called NYPD Enterprise, and that asserted offense was accomplished over a period of "two weeks" in which Franzone was allegedly barred from entering CTS. *See* SAC ¶ 186.

### B. Plaintiffs' RICO Conspiracy Claim Fails as a Matter of Law

To prevail on a § 1962(d) RICO conspiracy claim, a plaintiff must prove that defendants intended "to further an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] offense." *Crawford*, 758 F.3d at 489 (internal quotation marks omitted).

---

[9] *See also Crawford*, 758 F.3d at 488–89 ("[M]ultiple acts of mail fraud in furtherance of a single episode of fraud involving one victim" do not suffice to establish any "pattern" of racketeering (internal quotation marks omitted).); *Pier Connection, Inc. v. Lakhani*, 907 F. Supp. 72, 78 (S.D.N.Y. 1995) ("closed-ended" continuity absent where complaint "demonstrates that Defendants engaged in one scheme whose single goal was to seize control of [plaintiff's] business").

Plaintiffs' failure to plead a substantive RICO violation is thus "fatal to plaintiffs' RICO conspiracy claim under §1962(d)." *D. Penguin Bros., Ltd. v. City Nat'l Bank*, 587 Fed. App'x. 663, 669 (2d Cir. 2014); *see also Nat'l Group for Comm'ns. and Computers Ltd. v. Lucent Tech., Inc.*, 420 F. Supp. 2d 253, 272 (S.D.N.Y. 2006) ("Case law in this Circuit confirms that a 1962(d) conspiracy claim must be dismissed where the substantive RICO claim is deficient.").

* * * * * * * * * * * *

Having failed to allege the commission of two predicate acts by any defendant, or continuity, plaintiffs cannot establish the "pattern of racketeering" essential to their RICO claims. Accordingly, all RICO claims asserted in the SAC are dismissed, including as to the Tonuzi Defendants, the only RICO Defendants to have answered the complaint without moving to dismiss. *See Aetna Cas. And Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 591 (2d Cir. 2005) (deficiently pleaded claims can be dismissed "*sua sponte*, for failure to state a claim, as to non-moving defendants"); *accord Wachtler v. County of Herkimer*, 35 F.3d 77, 82 (2d Cir 1994).

## III.   Plaintiffs' § 1983 Claims Are Time-Barred

Alleging false arrest and constitutional deprivations of property and liberty interests, plaintiffs assert claims under 42 U.S.C. § 1983 against Tejera, Guerin and other unspecified "individual defendants." SAC ¶¶ 323, 344. There is no dispute that plaintiffs' § 1983 claims are subject to a three-year statute of limitations. *See Jones v. City of New York Ags.*, 550 Fed. App'x. 67, 68 (2d Cir. 2014) ("New York's general personal injury statute of limitations—three years—applies to § 1983 claims" asserted in New York.). There also is no dispute that plaintiffs' §1983 claims accrued, at the latest, on April 23, 2010, when Franzone was arrested by Tejera and Guerin.

Accepting this accrual date, plaintiffs acknowledge that "[o]rdinarily" their § 1983 claims would be time-barred because they did not "file a complaint by April 23, 2013." *Id.* Plaintiffs contend, however, that "[i]n the circumstances of this case" RICO's four-year statute of limitations is "applicable for recovery of all claims" they have asserted. *Id.* at 28–29. Plaintiffs have identified no basis, beyond *ipse dixit*, to extend RICO's limitations period to non-RICO claims. Plaintiffs' § 1983 claims are untimely.

There is, consequently, no basis to impose municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). *Monell* does not provide a separate cause of action but rather "*extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). Where, as here, the only § 1983 claims asserted in a complaint are time-barred, there is no § 1983 liability to extend. *See Jennis v. Rood*, 310 Fed. App'x. 439, 440–41 (2d Cir. 2009) (dismissing municipal liability claims where underlying § 1983 claims were time-barred). Moreover, plaintiffs have not plausibly alleged any policy or custom that might support the imposition of municipal liability.

## IV. State Law Claims

### A. Plaintiffs' False Imprisonment and Intentional Infliction of Emotional Distress Claims are Time-Barred

Under New York law, claims of false imprisonment and intentional infliction of emotional distress are subject to a one-year statute of limitations, *see* NYCPLR § 215(3), or a "one-year and ninety-day statute of limitations if brought against a state actor." *Allen v. Antal*, 2014 WL 2526977, at *15 (S.D.N.Y. Mar. 13, 2015) (citing N.Y. Court of Claims Act § 10(3-b)).

Here, plaintiffs' false imprisonment claim is predicated on Franzone's April 23, 2010 arrest, and the SAC identifies no subsequent events that could form the basis for a claim of intentional infliction of emotional distress. Accordingly, plaintiffs' false imprisonment and intentional infliction of emotional distress claims were long time-barred when plaintiffs filed their complaint on September 23, 2013. Seeming to recognize as much, plaintiffs assert that these claims, like their §1983 claims, should be afforded RICO's four-year limitations period. That contention is without merit.

## B. Plaintiffs' Breach of Contract Claim Against Progressive Is Meritless

Plaintiffs' only claim against Progressive is that it breached the 2000 Loan Agreement by failing to record its mortgage on Tonuzi's property. The theory of this claim is, to the extent coherent, convoluted. Plaintiffs seem to contend that, by not recording the mortgage, Progressive allowed Tonuzi to transfer her property unencumbered to defendants Hanna and Frank Alvarez and, as a result, Franzone now bears greater responsibility for satisfying the judgment Progressive obtained on the balance owed under the Loan Agreement.

This claim fails at the threshold because plaintiffs have identified no provision in the Loan Agreement requiring Progressive to record the Tonuzi mortgage. That is because there is no such provision. Certainly, it was in Progressive's best interests to record its mortgage, but Progressive did not contractually obligate itself to plaintiffs or anyone else to do so.

In any event, plaintiffs now concede that Progressive did in fact record the Tonuzi mortgage in 2007, three years *before* Tonuzi transferred the property to the Alvarezes. And plaintiffs admit further that Progressive was able to enforce the mortgage lien through foreclosure proceedings initiated in 2011, which Progressive settled for $150,000. Plaintiffs complain that Progressive waited until 2007 to record the mortgage. But just as there is no term

in the Loan Agreement requiring that the mortgage be recorded, there is no term requiring that it be recorded as of any particular date. Nor is there any indication that plaintiffs were damaged by the delay. *See Johnson v. Nextell Comm'n, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (to plead breach of contract under New York law, a complaint must allege, *inter alia*, "damages").

Plaintiffs' real grievance appears to be that Progressive settled its foreclosure action against the Alvarezes for an amount that does not fully satisfy the balance owed on the 2000 Progressive Loan. Plaintiffs, however, point to no authority under the Loan Agreement or otherwise by which they can dictate the terms on which Progressive settles litigation with third parties. That is, they fail to allege any contractual breach causing an injury. Plaintiffs' breach of contract claim against Progressive is dismissed.

### C. The Court Will Not Exercise Supplemental Jurisdiction Over The Remaining State Law Claims

The SAC asserts a number of additional state law claims against defendants who have not moved to dismiss, and these defendants have interposed several state law counterclaims and cross-claims. *See supra* at 10–11. Having disposed of all federal claims in the case, I decline to exercise supplemental jurisdiction over these remaining state law claims, counterclaims and cross-claims. *See* 18 U.S.C. § 1367(c)(3); *see also Seivright v. Montefiore Medical Center*, 2014 WL 896744, at *13 n.10 (S.D.N.Y. Mar. 3, 2014) ("Courts may decline to exercise supplemental jurisdiction over some [state law] claims while dismissing the remainder").

### CONCLUSION

For the foregoing reasons, all of plaintiffs' federal claims, as well as plaintiffs' state law claims asserting false imprisonment against defendants Tejera and Guerin, intentional infliction of emotional distress against all RICO Defendants, and breach of contract against Progressive,

are dismissed with prejudice.  The remaining state law claims, counterclaims, and cross-claims asserted in the pleadings are dismissed without prejudice pursuant to 18 U.S.C. § 1367(c)(3).

**SO ORDERED.**

s/Nina Gershon

**NINA GERSHON**
**United States District Judge**

**Dated: Brooklyn, New York**
      **May 1, 2015**